**EAGLE–PICHER INDUSTRIES, INC.**

v.

**LIBERTY MUTUAL INSURANCE COMPANY, American Motorists Insurance Company, Walbrook Insurance Company, Ltd., Winterthur Swiss Insurance Company, Southern American Insurance Company, Mutual Reinsurance Company, Ltd., St. Katherine Insurance Company, Ltd., London & Edinburgh General Insurance Company, Ltd., Bermuda Fire & Marine Insurance Company, Ltd., Dominion Insurance Company, Ltd., Yasuda Fire and Marine Insurance Company (U.K.), Ltd., Bellefonte Insurance Company, Turegum Insurance Company, Ltd., Mentor Insurance Company, (U.K.), Ltd., Assicurazioni Generali London, Stronghold Insurance Company, Ltd., Excess Insurance Company, London & Edinburgh Insurance Company, National Casualty Company of America, Ltd., Accident & Casualty Insurance Company, Argonaut Northwest Insurance Company, Slater, Walker Insurance Company, Ltd., John Basil Thomas Bird, a representative underwriter, and Philip Alan Froude, a representative underwriter.**

Civ. A. No. 78–2739–Z.

United States District Court,
D. Massachusetts.

Aug. 14, 1981.

Charles Parrott, Nutter, McClennan & Fish, Boston, Mass., for plaintiff.

Erik Lund, George Marshall Moriarty, Ropes & Gray, Francis Bousquet, Herlihy & O'Brien, Christopher Mansfield, Boston, Mass., Lewis Herman, Standard, Weisberg, Heckerling & Rosow, Louis Orgelfinger, Mendes & Mount, New York City, for defendants.

## MEMORANDUM OF DECISION

ZOBEL, District Judge.

This is a declaratory judgment action in which Eagle-Picher Industries, Inc. ("Eagle-Picher") requests a declaration of the rights, liabilities and obligations of the parties to certain insurance contracts. The defendants are insurance companies which had provided Eagle-Picher with primary comprehensive general liability insurance and with first and second layer excess insurance during the years 1968–1979. The questions of interpretation arise because Eagle-Picher has been named as a defendant in approximately 5,500 lawsuits in which the plaintiffs allege that they contracted certain asbestos-related diseases as a result of contact with asbestos-containing products manufactured by Eagle-Picher between 1931 and 1971. The basic question the Court must determine is whether insurance coverage is triggered as of the time or times the claimant was exposed to the asbestos-containing product ("Exposure Theory"), or whether such coverage is triggered when the asbestos-related disease first manifests itself by discoverable and diagnosable signs or symptoms, typically as much as twenty years after the initial exposure ("Manifestation Theory"). Whichever insurance company was "on the risk" at what is determined to be the triggering time or times must provide coverage, including payment of damages and provision of legal defense. The Court's interpretation of the policies will determine which insurance company or companies, if any, must defend against and pay any damages for the increasingly numerous underlying claims against Eagle-Picher. Plaintiff, Liberty Mutual Insurance Company and certain companies and underwriters in the London Market, known in these proceedings as the Bird Defendants[1], espouse the manifestation theory. American Motorists Insurance Company ("American Motorists") and certain other named members of the London Market, the so-called Froude Defendants[2], maintain that only policies in effect at the time of exposure provide coverage.

This opinion constitutes both Findings of Fact and Conclusions of Law.

Prior to 1968 Eagle-Picher was uninsured for the underlying asbestosis and related claims. From January 1968 through 1978 Liberty Mutual provided primary insurance with varying limits. From June 1973 to 1979 plaintiff was covered in addition by, first one and later two layers of excess insurance.

1. Walbrook Insurance Company, Ltd., Winterthur Swiss Insurance Company, Southern American Insurance Company, Mutual Reinsurance Company, Ltd., St. Katherine Insurance Company, Ltd., London & Edinburgh General Insurance Company, Ltd., Bermuda Fire and Marine Insurance Company (U.K.), Ltd., Dominion Insurance Company, Ltd., Yasuda Fire and Marine Insurance Company (U.K.), Ltd., Bellefonte Insurance Company, Mentor Insurance Company, (U.K.), Ltd., Assicurazioni Generali London, Stronghold Insurance Company, Ltd., London & Edinburgh Insurance Company, National Casualty Company of America, Ltd., Accident & Casualty Insurance Company, Argonaut Northwest Insurance Company, Slater, Walker Insurance Company, Ltd. and John Basil Thomas Bird, a representative underwriter.

2. Turegum Insurance Company, Ltd., Excess Insurance Company, and Philip Alan Froude, a representative underwriter.

The coverage provided by each excess layer goes into effect only if the policy limits of the layer beneath become exhausted. This three-layer coverage was achieved through the issuance of many short-term policies, by each insurer, typically covering one year at a time. Appendix A provides a graphic representation of the coverages in effect during the relevant period.

In 1977 Liberty Mutual sent to Eagle-Picher a warning notice that the policy limits for 1974 and 1975 might be exhausted. Eagle-Picher forwarded this notice to American Motorists and the London Market. American Motorists acknowledged receipt of the notice but indicated disagreement with Liberty Mutual's assignment of claims to policy periods and its handling of claims under the manifestation theory. By letter dated October 13, 1977 a New York law firm acting for the entire London Market sent a reservation of rights letter to Eagle-Picher concerning the underlying claims. The reservation of rights is based on the issue whether liability is to be determined under the manifestation or exposure theory. A genuine controversy exists between the parties with regard to the defendants' duties and obligations under their respective policies in connection with the underlying asbestos related claims.

All defendants with interests adverse to those of Eagle-Picher are citizens of states or countries other than Ohio, the state of incorporation of Eagle-Picher and the state where its principal place of business is located.

The insurance policies at issue all contain "coverage" clauses defining in general terms the scope of the coverage. In addition, the policies provide definitions of relevant terms. All are "occurrence-based", that is, coverage is provided for personal injury caused by an "occurrence" during the policy period. The policies, while quite similar, contain minor variations in language and punctuation which do not, however, affect the determination of the question presented so as to produce different results for different insurers. Before analyzing the policies, it is useful to lay out the relevant language.

1. Between January 1, 1968 and January 1, 1978, Liberty Mutual provided the plaintiff with primary comprehensive general liability insurance. The fourteen separate policies contain no more than two variations of each relevant clause. With respect to coverage, one variation, found primarily in policies written during the early years, provides:

> The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of...bodily injury...to which this policy applies, caused by an occurrence...

The second variation, found in policies covering January 1, 1976 to January 1, 1978, provides:

> The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury due to asbestos exposure caused by an occurrence if the bodily injury is included within the products hazard...

The policies include two slightly different definitions of relevant terms. The first provides:

> *Bodily injury* means bodily injury, sickness or disease sustained by any person.

> *Occurrence* means an accident, including continuous and repeated exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

The second provides:

> *Bodily injury* means bodily injury, sickness or disease sustained by any person, which occurs during the policy period, including death at any time resulting therefrom.

> *Occurrence* means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected or intended from the standpoint of the insured.

2. From June 1, 1973 to October 1975 American Motorists provided the plaintiff with a first layer excess umbrella policy, containing the following coverage clause:

The Company agrees to indemnify the insured for all sums which the insured shall become obligated to pay as damages, by reason of liability... because of personal injury... caused by or arising out of an occurrence which takes place during the policy period anywhere in the world.

The policy also contains the following definitions:

*Personal injury* means (a) bodily injury, shock, sickness or disease (including death, mental anguish, and mental injury resulting therefrom); ...

*Occurrence* means an accident, or a continuous or repeated exposure to conditions which results, during the policy period, in personal injury, ... property damage or advertising liability neither expected nor intended from the standpoint of the insured....

3. From October 10, 1975 through January 1, 1979 the so-called London Market provided plaintiff with first layer excess umbrella insurance, replacing American Motorists. The "London Market" is a group of insurance underwriters, each of whom underwrites a stated percentage of the total coverage provided by a single policy. The "coverage clause" of the London Market policy provides:

Underwriters hereby agree...to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability...imposed upon the Assured by law...for damages on account of: Personal Injuries...caused by or arising out of each occurrence happening anywhere in the world....

The policy also contains the following definitions:

The term *personal injuries* wherever used herein means bodily injury (including death at any time resulting therefrom,) mental injury, mental anguish, shock, sickness, disease, disability....

The term *occurrence* wherever used herein shall mean an accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises shall be deemed one occurrence.

4. The London Market also provided plaintiff with second layer excess umbrella coverage from September 1, 1973 to January 1, 1979. These second layer policies contain no independent coverage clauses or definitions; instead, they incorporate by reference the terms of the underlying policy. Each policy contains a clause providing for payment of damages "caused by or arising out of each occurrence... arising out of the hazards covered by and defined in the underlying umbrella policies...." Thus, between September 1, 1973 and October 10, 1975, the London Market second layer policies provided coverage in accordance with the terms of the underlying American Motorists first layer policy; from October 10, 1975 to January 1, 1979 the London Market second layer policies provided coverage as defined by the London Market's own first layer policies.

All parties to this dispute agree that the relevant policy language is clear and unambiguous. They disagree as to the meaning of the unambiguous language and the Court received certain medical evidence in aid of interpretation.

The coverage clauses, except that in the American Motorists policies, provide indemnity for all sums for which the insured shall become legally obligated to pay [liability imposed by law] for "damages because [by reason or on account] of...bodily [personal] injury... caused by [or arising out of] an occurrence..." American Motorists differ in that they agree to indemnify with respect to "an occurrence during the policy period."

The terms used in the policy are terms of art. Both "personal" or "bodily injury" and

"occurrence" are defined in each policy. Each term of art is linked to the next by the use of causal connectors such as "by reason of" "because of" and "caused by or arising out of." Liability is "caused" by injury, and injury in turn is "caused" by an occurrence. This construction implies that liability, injury, and occurrence, while necessarily connected, are nevertheless distinguishable. It means further that each element is expected to occur separately in time.

All policies except the later group of those written by Liberty Mutual define occurrence as "an accident or a continuous or repeated exposure to conditions which results, during the policy period, in personal injury..." This definition is broad and inclusive. Each "occurrence" is made up of two components, initial exposure or accident and resulting injury; neither one without the other would be sufficient. There can be no question but that the aspect of the occurrence which must take place within the policy period, however, is the "result", that is, the time when the accident or injurious exposure produces personal injury. The time-limiting phrase "during the policy period" always follows the word "results" and frequently is set off by commas, so that it can modify only the preceding verb "results". Thus, the definitional language explicitly focuses on the result rather than the cause as the component to which coverage is linked. This is equally true of the American Motorists policies. Even though their coverage clauses refer to "occurrence during the policy period," their definition of occurrence also links the resulting injury, not the exposure to conditions, to the policy period.[3]

The next question to be determined is what the policies mean by "personal" or "bodily injury" given the diseases which gave rise to the underlying claims. The exposure proponents maintain that "personal injury," within the meaning of these policies, occurs when the first sub-clinical cellular changes take place within the lung. They argue that asbestosis is not a disease at all, but a lengthy injurious process which begins with a series of minute but definite "insults" to the lungs. These insults comprise a succession of separate, compensable personal injuries, each of which, they say, meets the policy's requirement of resulting injury.

The manifestation proponents, on the other hand, contend that with respect to asbestosis, mesothelioma and broncogenic carcinoma, the policy term "personal injury" refers neither to a lengthy process, nor to a series of microscopic "insults", but to clinically evident, diagnosable disease. In the case of asbestosis, they argue, the "result" does not occur until the accumulated depositioning of asbestos fibers in the lung, with its attendant secretion of destructive enzymes, produces such significant interference with lung function that the victim suffers perceptible, measurable symptoms.

The exposure proponents bolster their arguments with sophisticated medical analyses of the fibrosing process from the time of exposure to the time of disability or death; in fact, an appreciation of these medical details is necessary in order to understand the exposure proponents' concept of minute "insults" to the lung. The manifestation

3. Recently, in *Am. Motorists Ins. v. E.R. Squibb & Sons*, 95 Misc.2d 222, 406 N.Y.S.2d 658 (1978) the Supreme Court for New York County adopted the manifestation rule in construing, with respect to claims for cervical cancer caused by the drug DES, an American Motorists policy which provided coverage for an "accident or injurious exposure to conditions which results, during the policy period, in bodily injury...." In *Squibb*, the exposure to the drug occurred in 1952, 1953 and 1961, while the disease only became manifest in 1970, 1971 and 1975, in the daughters of mothers who had ingested the drug. The Court found that "the policy language does not limit coverage to incidents of exposure during the policy period, but rather to conditions which result in bodily injury during the policy period. A reading of the policy language would appear to indicate that coverage is predicated not on the act which might give rise to ultimate liability, but on the result. It would be a strained interpretation to construe the occurrence clause as though it covered "exposure during the policy period which results in bodily injury." It is the result which is keyed to the policy period, and not the accident or exposure." *Id.* 406 N.Y.S.2d 658 at 659–660.

proponents, in contrast, argue that the policy terms must be analyzed from a layman's point of view. When this approach is taken, they say, no medical evidence is necessary; instead, the Court need only look to the common and everyday meaning of terms such as "disease" and "injury", in order to conclude that exposure results in injury when it manifests itself through clinically evident disease.

■ Because these questions were unresolved at the time of trial, and to aid in interpretation of the relevant language the Court received expert medical testimony from Dr. Bernard Gee, a research scientist and clinician with vast experience in the area of asbestos-related disease, and from Dr. Edward Burger, a researcher and administrator whose testimony was based on a review of current literature in the field and not particularly helpful. With minor exceptions, however, the testimony of the experts was not inconsistent. After careful consideration of that medical evidence, the insurance policy language, and the common meaning of the terms employed therein, I find that exposure to asbestos does not "result" in "personal injury" so as to trigger insurance coverage until such time as the accumulation of asbestos fibers in the lungs produce signs and symptoms capable of diagnosis as an asbestos-related "disease," in the commonly understood meaning of the term "disease." This finding is based on several considerations.

First, the testimony of both experts contradicted the central contention of the exposure theory that exposure and injury occur either simultaneously, or so nearly so that coverage for injury can most reasonably be linked to the time of exposure. The testimony of the exposure proponents' own expert, Dr. Gee, made it clear not only that exposure to asbestos typically does not produce clinically evident disease for as much as twenty years, but also that the sub-clinical injuries to the lung produced early in the destructive process do not occur simultaneously with the exposure. Before even

sub-clinical injury can occur, the asbestos fiber must pass a number of dichotomously branching tubes in the nose and throat which get progressively narrower, must reach the lung and become depositioned there, and must be enveloped by a scavenger cell, an alveolar macrophage which may then begin to produce destructive enzymes in a futile attempt to destroy the indestructible asbestos fiber. Because the fiber is not biodegradable, the macrophage continues to secrete enzymes which eventually destroy surrounding tissue and produce scarring. These tiny lung scars are the "insults" to which the exposure proponents refer. Along the way, nearly all fibers are removed, either through expectoration, by means of the physiological filters in the nose and throat, through being carried back up and out by the mucociliary escalator, or sometimes by being taken away by an alveolar macrophage through the lymphatic system or the mucociliary escalator.[4] Moreover, even when the fiber has become embedded in the lung and the scarring process has begun, the end result, that is, disabling disease or death, is by no means inevitable. In fact, Dr. Gee testified that over 90% of all urban city dwellers have some asbestos-related scarring, but only a tiny percentage of those exposed will ever develop clinical asbestosis. In short, exposure to asbestos does not produce instantaneous sub-clinical cellular changes; some amount of time necessarily passes before any destructive process begins. Also, there is no inevitability to the process—it may simply stop at any point along the way without ever producing clinically evident disease. This being so, to characterize as injury the minimal changes which occur in some people some time after exposure is not a supportable use of the word "injury" in the context of a liability insurance policy.

■ To say that exposure to asbestos results immediately in personal injury, is unreasonable for another reason. It is a basic tenet of insurance law that unambigu-

---

4. It is possible that such removal by a macrophage may, however, occur after insult to the alveolar region of the lung from secretion of enzymes by the same macrophage.

ous contract terms are to be given their common, popular and ordinary meaning, 13 J. Appleman Insurance Law and Practice § 7384 (rev. ed. 1976), 43 Am.Jur.2d Insurance, § 256.[5] Unless the insurance contract explicitly draws upon a technical or scientific meaning of a term, shared by both parties, the Court is to apply the meaning which a non-specialist would understand. *Lincoln Nat. Life Ins. Co. v. Erickson*, 42 F.2d 997, 1001 (8th Cir. 1930); *Reiser v. Metropolitan Life Ins. Co.*, 28 N.Y.S.2d 283, 262 App.Div. 171 (1941) *aff'd.* 289 N.Y. 561, 43 N.E.2d 534 (1942). In this case, while Eagle-Picher, a large manufacturer, might be expected to have technical knowledge relating to its products and enterprises, it cannot be assumed to have had sophisticated medical knowledge of the biochemical details of the asbestosis process,[6] or to have intended that any abstruse or unusual meanings be given to the terms in its product liability insurance policies. Where there is a conflict between a technical or medical definition and the meaning an average person would apply to an insurance term, the court will accept and apply the layman's viewpoint. *Irelan v. Standard Mutual Assoc.*, Mo.App., 379 S.W.2d 815 (1964). As a result, the Court must interpret the policy from the point of view of the layman.

The policies define personal injury or bodily injury in lay terms, "bodily injury, shock, sickness or disease (including death, mental anguish and mental injury resulting therefrom.)" The exposure proponents assert that asbestosis is a process, not a disease, and that coverage should be provided for a series of minute personal or bodily insults to the lung. The manifestation proponents point out that all of the underlying

claims against Eagle-Picher allege fully manifested asbestos-related diseases, not sub-clinical cellular injuries, and they argue that to a layperson, asbestosis or asbestos-related injury means symptomatic diagnosable disease, regardless of what the terms might mean to a research scientist.

Dr. Gee, who is also a clinician with vast treatment experience, proffered his own definition of "asbestosis" as an injury mechanism which is present soon after the first asbestos fiber is embedded in the lung, but went on to distinguish between his specialized meaning of the word in the context of research and the meaning he would give the word as a treating physician. According to Dr. Gee, "when a patient asks 'Do I have asbestosis?' He means: Do I have clinically evident disease by your methods, including my own perceptions, that is, the patient's, . . . . He doesn't mean: Do I have some injury mechanism going on." Dr. Gee drew the same distinction again when he said, with reference to a patient's history of exposure to asbestos, and the presence of asbestos in his lung, "If I find asbestos, I cannot conclude without other evidence that there is clinical disease. I can conclude that there is an injury mechanism set in motion." That testimony, combined with the ordinary meaning of the coverage language, leads to the conclusion that exposure to asbestos results in "personal injury" when it produces clinically evident diagnosable disease, that is, when it becomes manifest. Although the injurious process begins many years prior to the eventual manifestation of clinical asbestosis, the phrase "results in personal injury" cannot, absent the application of a hypertechnical definition of the words, refer to the earliest sub-clinical cellular damages, but must refer, to the

---

5. The parties raised before trial the question whether the law of Ohio, of Illinois, or of England should control the interpretation of the insurance contracts at issue here. I find that there is no true conflict among all potentially applicable laws, and therefore I do not reach the question of which state law would be applied to these contracts. *Forsyth v. Cessna Aircraft Co.*, 520 F.2d 608, 612 (9th Cir. 1975).

6. Dr. Gee agreed that his work is on the cutting edge of one area of the developing science in this field, that indeed, only within the last five to eight years has attention in the field focussed on biochemical cellular changes rather than microscopy and morphology. His testimony is in large part based on that new focus.

time when the individual has clinically evident disease.

The scope of the Court's analysis so far has been limited to an examination of the text of the policies and to a review of the relevant medical testimony. However, because other courts have come to different conclusions and because the rules of construction governing the interpretation of insurance contracts explicitly serve certain public policy goals, it is appropriate to assess the manifestation theory in a broader context.

The Sixth Circuit, in a recent decision, affirmed the District Court's adoption of the exposure theory.[7] It nevertheless concluded that it was "bound to broadly construe the insurance policies to promote coverage." *Ins. Co. America v. Forty-Eight Insulations*, 633 F.2d 1212, 1219 (6th Cir. 1980)—(hereafter "Forty-Eight"). The underlying facts of the *Forty-Eight* case are, from a public policy point of view, substantially different from those at issue here. In that case, Forty-Eight had purchased liability insurance as far back as 1955, but its coverage starting in 1976 contained such a large per person deductible for asbestos cases that the court found that "as a practical matter, Forty-Eight is uninsured for asbestosis occurring after 1976." *Forty-Eight, supra*, at 1216 n.6. This consideration led the Court to reject as not controlling precedents in the area of health insurance which it found to be "most relevan[t]."[8] Although the Court acknowledged that these cases appeared to support the manifestation theory, it nevertheless held that they in fact supported the exposure theory because "the health insurance cases rely on the same rules of construction that we think are applicable here: insurance policies must be strictly construed in favor of the injured and to promote coverage; similarly a policy must be construed to favor the legitimate expectations of the parties." *Forty-Eight, supra*, at 1221. The Court went on to conclude:

> In this case, we are faced with two possible constructions, one of which is likely to leave the manufacturer insured, the other of which leaves the manufacturer uninsured for all practical purposes. We think that Illinois and New Jersey courts [the states whose law was arguably applicable to the insurance contracts] would try to construe the contract language to embrace the exposure theory. *Forty-Eight, supra*, at 1222.[9]

7. The *Forty-Eight* opinion was recently adopted both as to "reasoning and result" by the Fifth Circuit, in *Porter v. American Optical Corp.*, 641 F.2d 1128, 1145 (5th Cir. 1981). See also, *Keene Corporation v. Ins. Co. of No. Amer.*, 513 F.Supp. 47 (D.C.D.C.1981).

8. The cases cited by the Sixth Circuit are part of a line of cases which, interpreting clauses in insurance policies which exclude from coverage any sickness or diseases originating and commencing prior to the issuance of the policy, nevertheless find in favor of coverage where the disease becomes manifest during the policy period, although the medical cause clearly existed prior to manifestation. See, e. g. *Royal Family Ins. Co. v. Grimes*, 42 Ala.App. 481, 168 So.2d 262 (1964); *Reiser v. Metropolitan Life Ins. Co.*, 262 App.Div. 171, 28 N.Y.S.2d 283 (1941) *aff'd*. 289 N.Y. 561, 43 N.E.2d 534 (1942) (Presence of calcium deposits which might never have become a source of physical disturbance not a disease until manifest. The meaning of the agreement must not be that of the scientist but that of the average person.); *Metropolitan Life Ins. Co. v. Reynolds*, 48 Ariz. 205, 60 P.2d 1070 (1936) ("Defendant is liable, though the medical cause of the disease existed prior to the policy, if the disease or sickness does not manifest itself until afterwards. So the ordinary man wanting health protection would understand it." 60 P.2d at 1073); *Fuller v. Aetna Life Ins. Co.*, 259 F.2d 402 (5th Cir. 1958); 10 Couch on Insurance 2d § 41.814 at 639.

9. The *Forty-Eight* decision appears to rest primarily on considerations of policy and result. However, insofar as it is based on review and interpretation of the medical evidence relating to asbestosis, it rests on findings with which I am not in agreement. The Sixth Circuit accepted the notion that every "insult" to tissue in the lungs constitutes "bodily injury" within the meaning of the applicable insurance policies. My review of the medical evidence persuades me that these sub-clinical changes, only recently identified by the most sophisticated medical research techniques, constitute neither "bodily injury" nor "disease" within the common and ordinary meaning of these terms.

In the present case, the Court is similarly faced with one construction which would provide coverage, and another which leaves Eagle-Picher uninsured. Here however, it is the manifestation theory which is like to maximize the coverage provided to Eagle-Picher in the underlying lawsuits. As the earlier discussion demonstrates, this court's adoption of the manifestation theory is grounded on a finding that the relevant text of the insurance policies, as explained by the medical evidence dictates manifestation. An additional strand of support for this conclusion, however, is provided by the fact that application of general rules of insurance policy construction, with their public policy underpinnings, produces the same result.

The facts of this case also indicate that manifestation most closely approximates the expectations of the contracting parties. As noted above, Eagle-Picher was uninsured during most of the thirty years up to 1971 during which it manufactured asbestos. Only in 1968 did Eagle-Picher first purchase general liability coverage. During the years after 1971, when Eagle-Picher ceased to produce asbestos-containing materials, it nevertheless continued to purchase, and in increasing amounts, insurance coverage for damages due to injury caused by asbestos exposure [See App. A]. Although there was scant possibility that claims based on further exposure to asbestos would be made, it could certainly be predicted that increasingly numerous manifestations of asbestos-related diseases would occur, giving rise to increasingly numerous claims against Eagle-Picher. The fact that Eagle-Picher bought substantial amounts of insurance explicitly keyed to damages due to asbestos exposure during a period when no such exposures were taking place lends yet further support to the conclusion that the expectation of the contracting parties was that coverage would be provided on a manifestation, rather than an exposure, basis.

Having found in favor of manifestation, a workable definition of the term "manifestation" remains to be delineated. The parties have proferred several possibilities. These include the date on which an asbestosis victim "knows or has reason to know" he has the disease, the date on which a victim's symptoms become "capable of medical diagnosis," the date of actual diagnosis, or the date of death. Because of the thousands of underlying lawsuits against plaintiff, each seeking damages for asbestos-related disease, the policies in issue must be interpreted not only to reflect the manifestation concept, but also to ensure that coverage is certain, and the availability of coverage is easily ascertained and easily demonstrated. I conclude that with respect to all claims under the insurance policies at issue in this case, coverage shall be provided when the asbestos-related disease becomes manifest, as measured by the date of actual diagnosis or, with respect to those cases in which no diagnosis was made prior to death, the date of death. This holding does not require pro rata sharing or apportionment of damages on account of Eagle-Picher's liability for asbestos-related claims.

Judgment shall enter in accordance with this opinion.

AMOUNT OF INSURANCE
INSURERS

APPENDIX A

□ - second layer excess
▨ - first layer excess
▦ - primary