DECISION RE INSURANCE PROCEEDS
BURTON PERLMAN, Chief Judge.
Debtors filed a motion for turnover of insurance proceeds from fifth layer excess liability insurance carriers, A.I.G. Insurance and Lexington Insurance Companies (hereinafter, “Insurers”). The coverage is for up to $10 million in damages and expenses incurred in connection with asbestos-related personal injury claims manifesting themselves from February 1, 1978 through January 1,1979. The Insurers are only required to make payments under the policies after debtors have exhausted the policy limits of $42.5 million of underlying asbestos-related personal injury insurance.
Debtors submitted a claim to the Insurers, and the Insurers have objected to elements of the claim. Specifically, the Insurers contend that the amount paid out by debtors in settlement of certain claims is not reimbursable because the only evidence in those cases that the injury was diagnosed within the applicable time period, is contained in the complaint filed against debtors, and the Insurers say that this is not probative. The Insurers also assert that, pursuant to the terms of the policies, Liberty Mutual Service Fees and the ACF surcharges are not reimbursable.
This court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this District. This is a core proceeding arising under 28 U.S.C. § 157(a). Debtors and the Insurers have agreed that this court is the appropriate forum for resolution of the controversy with respect to the disputed insurance coverage.
Eagle-Picher in the past has sought coverage under its primary and excess policies for asbestos claims asserted against it. Questions arose regarding which policy covered the claims. Eagle-Picher filed two declaratory judgment actions against its carriers seeking a declaration of the rights, liabilities, and obligations of the parties under the insurance policies. See, Eagle-Picher Indus., Inc. v. Liberty Mutual Ins. Co., 523 F.Supp. 110 (D.Mass.1981), aff'd as modified, 682 F.2d 12 (1st Cir.1982), cert. denied sub nom. Froude v. Eagle-Picher Indus., Inc., 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983) and Eagle-Picher Indus., Inc. v. Liberty Mutual Ins. Co., 460 U.S. 1028, 103 S.Ct. 1280, 75 L.Ed.2d 500 (1983) (hereinafter Eagle-Picher I).
In light of Eagle-Picher I and faced with the possibility of further protracted and costly litigation, Eagle-Picher and the Insurers negotiated a settlement with respect to the coverage for asbestos-related claims that may have occurred during the Insurers’ term of policy coverage. In 1984, the Insurers separately entered into identical confidential settlement agreements with Eagle-Picher. Under those agreements, the parties agreed that the application and interpretation of the Insurers’ policies with respect to claims would be governed by Eagle-Picher I.
Thus, the agreements said at p. 1, para. 1:
“The application and interpretation of the policies shall be governed by (i) the decision of the United States Court of Appeals for the First Circuit in the Eagle-Picher insurance coverage litigation and (ii) the terms of the Agreement.”
The parties then compromised and agreed upon a mechanism for determining the date of occurrence, determinative of one of the issues here in controversy, of the asbestos-related bodily injuries alleged in the underlying complaints. Section 1.2. of both settlement agreements state:
2. The date of occurrence for any Asbestos-Related Disease Claim against Eagle-Picher shall be the date five years prior to the first date of the actual diagnosis of such disease. In the event the first date of actual diagnosis is not known when the claim is made or the action is filed, the date of occurrence *251 shall be deemed to be the date five years prior to (i) the date the claim or action is received by Liberty Mutual Insurance Company [Eagle-Picher’s primary insurance carrier] or (ii) the date of death, whichever occurs first, provided, however, that if the first date of actual diagnosis is subsequently determined for such a claim or action, then the date five years prior thereto shall become the date of occurrence.
To establish that a claim has occurred during the Insurers’ period of policy coverage and is thus covered under those policies, evidence had to be provided of: (1) the first date of actual diagnosis; (2) the date that Liberty Mutual received the underlying claim; or (3) the date of death.
Liberty Mutual was Eagle-Picher’s primary carrier in debtors’ underlying insurance coverage. When the Liberty Mutual underlying coverage was exhausted, Eagle-Picher entered into an entirely separate claims-handling agreement with Liberty Mutual whereby Liberty Mutual continued to handle the entire defense, management and administration of a sizable percentage of asbestos claims. Liberty Mutual received approximately $450.00 per case for administering and managing each case.
Subsequent to the negotiation of the confidential settlement agreement in 1984, Eagle-Picher joined the Asbestos Claims Facility (hereinafter ACF), which was established in late 1985. The ACF was created by certain asbestos defendants and their insurers to act as a central clearinghouse for asbestos claims, administering, defending, and settling them, and then determining who pays how much for the associated costs. Each participant paid a share of costs of ACF based upon a predetermined formula, incurred in administering, defending, and diagnosing asbestos-related claims. In other cases where outside defense counsel were retained by debtors, Liberty Mutual provided management and administrative services.
Debtors have requested reimbursement for costs paid, respectively, to Liberty Mutual on account of the claim’s handling agreement, and to ACF for its surcharges. The Insurers have declined payment of the amounts requested. The controlling language in the agreements was, at p. 2, para. 3:
“For purposes of determining Eagle-Picher’s right to reimbursement from the Insurers for ‘ultimate net loss’ as defined in the policies, the aggregate limits in the underlying policies shall be exhausted, or shall be deemed to be impaired or exhausted, in accordance with the terms of paragraph 2 above.”
Thus we are told that the definition of “ultimate net loss” is to be found in the “policies”. “Policies” here refers to Policy No. 75-100102 issued by AIU, and Policy No. 5512868 written by Lexington Insurance Co. The parties agree that both such policies incorporate definitions contained in an underlying Lloyd’s Policy No. 75-16280-3. That policy contains the definition of ultimate net loss to be applied here:
“The terms ‘Ultimate Net Loss’ shall mean the total sum which the Assured, or his Underlying Insurers as scheduled, or both, become obligated to pay by reason of personal injuries, property damage or advertising liability claims, either through adjudication or compromise, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of an occurrence covered hereunder, excluding only the salaries of the Assured’s or of any underlying insurer’s permanent employees. The Underwriters shall not be liable for expenses as aforesaid when such expenses are included in other valid and collectible insurance.”
Eagle-Picher ultimately submitted to the Insurers a claim for the asbestos-related injury complaints. After deducting the $42.5 million in underlying coverage which had been exhausted, Eagle-Picher sought reimbursement from the Insurers for the *252 remainder. Of the amount originally sought, the Insurers paid $4,600,933.00 to Eagle-Picher pursuant to this court’s Order of August 21, 1991. The Insurers refuse to pay: (1) claims totaling $853,074.00 that Eagle-Picher submitted to the Insurers based upon a complaint diagnosis date; (2) Liberty Mutual’s service fees, amounting to $1,937,206.00; and (3) the ACF surcharges amounting to $1,010,210.00.
1. Date of Diagnosis.
We have above quoted the paragraph of the agreement which is here pertinent. We are not informed specifically the language employed by claimants in complaints filed against debtors, but both parties to the present controversy argue on the basis that there were 104 complaints filed containing an allegation of “the first date of the actual diagnosis of such disease.” Such allegations are asserted by debtors, if the date falls within the time period of coverage, to warrant payment by the Insurers. Debtors argue, first, simply that the assertion of a diagnosis date in a complaint means that “the first date of actual diagnosis” is known. Secondly, debtors argue that the law of the State of Ohio is here applicable, and state law per Willoughby Hills v. Cincinnati Insurance Co., 9 Ohio St.3d 177, 180, 459 N.E.2d 555, 558 (1984) holds that allegations in pleadings are sufficient to lay upon an insurer the duty to defend a claim arguably within policy coverage. Debtors say that by the same token, complaint allegations should be sufficient to require the indemnification by the Insurers here sought.
In response, the Insurers say that allegations in a complaint of a date of diagnosis plainly are outside the language of the agreement. To support their position, the Insurers present authority that the obligation of an insurer to indemnify requires proof of actual rather than alleged facts. See Cooper Laboratories, Inc., v. International Surplus Lines, Co., 802 F.2d 667, 675 (3d Cir.1986); Air Products and Chemicals, Inc. v. Hartford Accident and Indem. Co., 707 F.Supp 762, 766 (E.D.Pa.1989), on reconsideration in part, 1989 WL 73656, 1989 U.S.Dist. LEXIS 7435 (June 30, 1989).
As rebuttal to debtors’ position that authority regarding duty to defend is here applicable, the Insurers argue that such authority is inapplicable here because the duty of an insurer to defend is broader than its duty to indemnify. See Reliable Springs Co. v. St. Paul Fire & Marine Ins. Co., 869 F.2d 993, 994 (6th Cir.1989); Morton v. Safeco Ins. Co., 905 F.2d 1208, 1211 (9th Cir.1990).
The court finds itself in the curious position of having to tell the parties who negotiated an agreement what they meant by the language they employed, for there is no proposition more firmly established in the law that in interpreting a contract the court looks to the intention of the parties. See e.g., Aultman Hosp. Ass’n. v. Community Mut. Ins. Co., 46 Ohio St.3d 51, 53, 544 N.E.2d 920, 923 (1989). See also 17A Am.Jur.2d Contracts § 350 at 364-65 (1991); 18 O.Jur.3d Contracts § 136 at 19 (1980). The language which the parties employed seems perfectly clear. The policies in question were not general indemnification policies for all asbestos related claims. Instead, they were for such claims which arose in a circumscribed time period, the period of coverage. The parties reached agreement upon that time period. But it was also necessary for the parties to reach agreement about how it was to be established that a claim was within the period of coverage.
The parties agreed that for a claim to be within the covered time period, a date of occurrence of disease would be assumed to be five years prior to the first date of actual diagnosis. The question before us turns on what the parties meant by the phrase “actual .diagnosis.” (In their agreement, they provided alternatives in the event that the date of “actual diagnosis” was “not known.” So in reaching their agreement, they contemplated that in some instances, the date of “actual diagnosis” would “not” be “known”.)
The parties probably would not disagree that actual diagnosis means an opinion by a physician of asbestos related disease. The *253 difference between the contending parties is whether, on the one hand, a dated document comprising a medical opinion must be presented in support of a claim, or whether it is sufficient if the existence of such a medical report is alleged in a complaint.
We are impressed by the assertion of the Insurers that debtors initially submitted 199 claims based upon complaint allegations alone, and that after refusal of the Insurers to pay those claims, debtors obtained medical reports establishing the diagnosis dates for 95 of the claims. It seems fair to infer from this that debtors are unable to secure medical reports for the remaining 104 claims. They now contend that they are entitled to indemnification without such support.
After considering the arguments of the parties, but most importantly, the language of the agreements themselves, we hold that mere allegation in a complaint of a date of diagnosis is insufficient to warrant indemnification. See, e.g., Reliance Ins. Co. v. Kent Corp., 896 F.2d 501, 503 (11th Cir.1990); C.H. Heist Caribe Corp. v. American Home Assur. Co., 640 F.2d 479, 483 (3d Cir.1981) (distinguishing between the duty to defend and the duty to indemnify); Air Products and Chemicals, Inc. v. Hartford Accident and Indem. Co., 707 F.Supp. 762, 766 (E.D.Pa.1989), on reconsideration in part, 1989 WL 73656, 1989 U.S.Dist. LEXIS 7435 (June 30, 1989) (citing C.H. Heist). Instead, evidence by way of a documented medical opinion was intended in the agreement. There is no reason why debtors should not be required to present direct evidence of “actual diagnosis”. That is what the contract in plain language says. See Allen v. Standard Oil Co., 2 Ohio St.3d 122, 124, 443 N.E.2d 497, 499 (1982) (contract interpretation unnecessary where language of contract is unambiguous). Notwithstanding our holding, debtors are not precluded from recovery, although they say that considerable effort on their part will be required, because the contract itself provides alternatives in the event that debtors are unable to provide an "actual diagnosis”.
2. Ultimate Net Loss Issues.
As depicted above, debtors entered into agreements with Liberty Mutual and with the ACF. These entities on a contract basis handled the disposition of the many asbestos related claims that were filed against debtors. Debtors now contend that these expenditures are within the present insurance coverage because they represent sums paid by debtors in defending asbestos claims, and are specifically contemplated by the definition of “ultimate net loss” appearing in the coverage and quoted at pp. 251 and 252 above.
Debtors say that involved are expenses for "... lawyers ... and other persons, and for litigation, settlement, adjustment and investigation of claims.” Using this language, debtors argue that if the fees in question are for attorneys, they are expenses as expressly provided for lawyers. If they are related unallocated expenses, i.e. not for lawyers, then they are expenses to “other persons” for services mentioned in the defining clause. Debtors argue that by entering into an agreement with Liberty Mutual and with the ACF, they saved the Insurers considerable amounts of money, for if the cases were handled in conventional fashion by retained counsel, the cost would have been substantially greater. Additionally, debtors point out that the London Market Insurers made payment on the underlying coverage, and in doing so paid the kinds of fees here in issue. This, they say, confirms the obligation of Insurers to pay the present expenses. Debtors also cite us to Eagle-Picher Industries, Inc. v. Liberty Mutual, 523 F.Supp. 110 (D.Mass.1981), as useful precedent. The present expenses, say debtors, are no different than reimbursement for outside defense counsel fees which Insurers have already paid.
Insurers argue, first, that administrative expenses are simply excluded from the coverage of the policies. They argue that the Liberty Mutual service fees represent the cost of doing business, and this is not provided for in the agreement and therefore not covered. It cites Aetna Casualty & Sur. Co. v. Gulf Resources & Chem. *254 Corp., 709 F.Supp. 958, 962 (D.Idaho 1989), rev’d on other grounds, Aetna Casualty and Surety Co. v. Pintlar Corp., 948 F.2d 1507 (9th Cir.1991), for the proposition that cost of doing business is not covered under a comprehensive general liability policy. Insurers take the position that only identifiable indemnity amounts or legal fees are reimbursable under the policy.
Once again, we turn to the language of the policies, particularly the definition of “ultimate net loss” quoted above. We find the charges of Liberty Mutual and ACF to be clearly within that language. Ultimate net loss in its definition starts out with inclusion of the “total ” sum which debtors are obligated to pay “by reason of personal injuries, property damage or advertising liability claims, either adjudication or compromise.” The remaining language of the paragraph does not limit the broad sweep of that language. There can be no doubt that the sums paid to Liberty Mutual and ACF were by reason of personal injuries, and are included within the total sum which debtors became obligated to pay. “Total” is inconsistent with so limited an interpretation of the policy language as that urged by the Insurers, that only indemnification and attorneys’ fees are intended. The follow on clause after “adjudication or compromise” in the definitional paragraph says what is “also” included in addition to the “total sum”. If there were any question of the scope of the earlier language, the express inclusion of sums paid as salaries, of expenses for investigators and other persons, and for adjustment and investigation of claims amplify the intent of the parties that the coverage be very comprehensive, certainly enough to embrace the reasonable steps taken by debtors in retaining the services of Liberty Mutual to dispose of claims, and to participate in the ACF, likewise an expert facility in this field.
3. Interest.
Because we resolve the disputes before us in part in favor of debtors, we reach the further question of whether debtors are entitled to prejudgment interest on that award. The parties are in agreement that state law governs this decision. Further, they agree that Ohio Revised Code § 1343.03(A) dealing with money due and payable upon an instrument in writing, governs the present decision. That statute provides that interest is due when money becomes due and payable upon an instrument in writing. An insurance policy is such an instrument. Clevenger v. Westfield Co., 60 Ohio App.2d 1, 3, 395 N.E.2d 377, 379 (Ohio App.1978). While the parties are in agreement about the general rules here applicable, they disagree as to how they should be applied to the controversy before us. Insurers say that to qualify for prejudgment interest, the underlying amount sought must both be liquidated and due and payable. They say that neither condition is met here. Debtors, to the contrary, assert that the amount is clearly liquidated, and was due and payable upon the date of demand, April 16, 1991.
In Motorists Mutual Insurance Co. v. Badr Said, No. 57418, 1990 WL135659, 1990 Ohio App. LEXIS 4092, at *21 (Cayahoga Cty., Ct.App. September 20, 1990), the court said:
Generally, a trial court shall order an award of prejudgment interest pursuant to R.C. 1343.03(A) where the dispute is over liability itself and the amount of liability is not in dispute or readily ascertainable. Horning-Wright Co. v. Great American Ins. Co. (1985) 27 Ohio App.3d 261, 263 [500 N.E.2d 890].
In the matter before us, certainly the dispute is over liability itself, for the parties are arguing for differing interpretations of relevant provisions of the insurance policies. There is no real dispute about the amount of liability. While there has been a trifling difference between the parties with respect to the claim on account of the Liberty Mutual segment, the amount of the difference is certainly de minimis.
Accordingly, we hold that debtors are entitled to recover from Insurers the amount of $1,937,206.00 on account of Liberty Mutual service fees and $1,010,210.00 on account of ACF surcharges, with interest on both those amount from April 16, 1991 at 10% per annum as provided by O.R.C. § 1343.03(A). We hold further that *255 debtors are not entitled to recover from Insurers for claims submitted by debtors to the Insurers based upon a diagnosis date stated only in the complaint.