**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 06-1334**

———————

PHARMACISTS MUTUAL INSURANCE COMPANY,

Plaintiff - Appellant,

versus

G. DAVID SCYSTER, as Administrator of the
Estate of Mary Virginia Scyster and
Individually Estate of Mary Virginia Scyster;
VIRGINIA RAUCH; VIVIAN CONRAD; DONALD M.
BOLES; ANNIE MCGILL,

Defendants - Appellees,

and

R. KEN MASON, JR.; URGENT CARE PHARMACY
INCORPORATED; W. RAY BURNS; EVELYN ARROYO;
DANIEL W. BOWMAN; JAMES HICKMAN; SHIRLEY KUS;
ROBERT BLACK; DEBORAH J. HENSLEY,

Defendants.

———————

Appeal from the United States District Court for the District of
South Carolina, at Spartanburg. Henry M. Herlong, Jr., District
Judge. (7:04-cv-01922-HMH)

———————

Argued: January 30, 2007                    Decided: May 7, 2007

———————

Before WILKINSON, GREGORY, and DUNCAN, Circuit Judges.

———————

Affirmed by unpublished opinion. Judge Wilkinson wrote the opinion, in which Judge Gregory and Judge Duncan joined.

—————————

**ARGUED:** James Dunbar Myrick, BUIST, MOORE, SMYTHE, MCGEE, P.A., Charleston, S.C., for Appellant. James B. Maxwell, MAXWELL, FREEMAN & BOWMAN, P.A., Durham, North Carolina; H. Forest Horne, Jr., MICHAELS, JONES, MARTIN, PARRIS & TESSNER, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Adriane Malanos Belton, BUIST, MOORE, SMYTHE, MCGEE, P.A., Charleston, S.C., for Appellant. William M. Grant, Jr., GRANT & LEATHERWOOD, P.A., Greenville, South Carolina, for Appellees; Joe McLeod, THE MCLEOD LAW FIRM, Fayetteville, North Carolina, for Appellee Virginia Rauch.

—————————

Unpublished opinions are not binding precedent in this circuit.

WILKINSON, Circuit Judge:

Pharmacists Mutual Insurance Company appeals a decision that a policy it issued to R. Ken Mason, Jr., covered claims against Mason for injury and death caused by contaminated medications produced at the pharmacy where Mason worked. The insurer seeks to avoid liability on the grounds that its policy excludes damages from willfully illegal acts and damages from the manufacture of pharmaceuticals, and on the grounds that some persons fell ill during the policy period but received their injections of the medication prior to the policy's effective date. We find that no evidence supports an inference that Mason intentionally violated the law or was engaged in manufacturing, and that under South Carolina law, damages are covered so long as they arose during the policy period. We therefore affirm the judgment.

I.

Pharmacists Mutual Insurance Company ("Pharmacists Mutual") brought this declaratory judgment action to determine its potential liability for injuries and deaths from contaminated doses of methylprednisolone produced at Urgent Care Pharmacy, Inc. ("Urgent Care"), in Spartanburg, South Carolina. The insured, R. Ken Mason, was Urgent Care's pharmacist-in-charge and oversaw the compounding of medications, although he did not personally compound drugs. W. Ray Burns owned the pharmacy. The defendant-appellees are a number

3

of those who have filed suit against Mason because of the drug contamination: G. David Scyster, Virginia Rauch, Vivian Conrad, Donald M. Boles, and Annie McGill.

A.

Urgent Care distributed the contaminated methylprednisolone at issue in this case to two medical practices in North Carolina, the Johnston Pain Clinic and Pinehurst Anesthesia Associates. After the Upjohn pharmaceutical company stopped manufacturing methylprednisolone, a sterile injectible drug used to treat severe back and joint pain, Dr. Scott Johnston of the Johnston Pain Clinic and Dr. Burt Place of Pinehurst Anesthesia Associates each contacted Urgent Care to ask whether the pharmacy could compound the drug for them.

Dr. Johnston ultimately bought 525 vials of the drug from Urgent Care between March 5, 2002 and August 20, 2002, for administration in his clinic's offices. Vivian Conrad was treated with injections of Urgent Care's methylprednisolone at the Johnston Pain Clinic and contracted fungal meningitis because the medication was contaminated. Conrad passed away as a result on November 10, 2003.

Dr. Place's practice purchased 557 vials from Urgent Care between May 6, 2002 and June 5, 2002. He and his partners administered the drug at their practice to defendant-appellees

4

Donald Boles, Annie McGill, and Virginia Rauch, and to Mary Virginia Scyster, whose estate is administered by defendant-appellee G. David Scyster. Those patients allegedly fell ill with meningitis because the painkiller was contaminated, and Mary Virginia Scyster allegedly passed away as a result.

When patients from Johnston Pain Clinic and Pinehurst Anesthesia Associates became sick in mid-2002, the South Carolina Board of Pharmacy ("the Board"), began an investigation of Urgent Care. Government investigators subsequently determined that methylprednisolone produced by Urgent Care had been contaminated with <u>wangiella dermatitidis</u>, a fungus mold that is linked to spinal meningitis.

The Board found multiple apparent violations of the South Carolina Pharmacy Practice Act. It issued a cease-and-desist order to Urgent Care, Burns, and Mason on September 27, 2002, stating, in part, that Urgent Care, Burns and Mason had engaged in manufacturing because "you have not been adhering to good compounding practices based on the existence of a pharmacist/patient/practitioner relationship." Sheila Young, the Board's manager of regulatory compliance, said in a deposition that the Board made this finding because Urgent Care had been manufacturing Bimix and Trimix. In contrast, she testified, Urgent Care had been compounding methylprednisolone, not manufacturing it. Paul W. Bush, a pharmacy director who reviewed records of Urgent

5

Care's activities, explained in a deposition that the evidence supported these conclusions. Urgent Care appeared to have manufactured Bimix and Trimix because it distributed the drugs to physicians who resold them for use outside their offices, even though Urgent Care did not know the identity of the patients who ultimately used the drugs. In contrast, there was no evidence that Urgent Care's methylprednisolone was resold or used outside of physicians' offices or medical institutions.

The cease-and-desist order also stated that Mason and Urgent Care appeared to have violated other requirements of the South Carolina Pharmacy Practice Act, including sterilization standards, contamination-monitoring procedures, and maintenance rules. The order demanded that Mason and Urgent Care stop compounding activities. Mason has since agreed to relinquish his pharmacy permit, while admitting no wrongdoing.

### B.

Pharmacists Mutual filed this action seeking a declaratory judgment that lawsuits against Mason relating to methylprednisolone would not be covered by the individual professional liability policy that Pharmacists Mutual had issued to Mason, and that the insurer had no duty to defend such lawsuits. Pharmacists Mutual's policy covers only Mason, not Urgent Care, and provides only excess coverage, available for damages not covered by another policy. The

6

policy applies to losses from occurrences, personal injuries, and advertising injuries "arising out of your rendering or failure to render pharmacy services" for the period between June 19, 2002 and June 19, 2003.

Under the policy, "pharmacy services" are defined to include compounding, which in turn includes "the preparation, mixing, assembling, packaging, or labeling of a drug or device . . . as a result of a practitioner's prescription drug order or initiative based on the practitioner/patient/pharmacist relationship in the course of professional practice." Compounding "also includes the preparation of drugs or devices in anticipation of prescription drug orders based on routine, regularly observed prescribing patterns" and "such other practices as are approved as a part of the practice of pharmacy by the Board of Pharmacy in the state in which you practice." The policy does not cover manufacturing, which it defines to include "the preparation and promotion of commercially available products from bulk compounds for resale by pharmacies, practitioners, or other persons" and the "promotion and marketing" of the drugs that a pharmacy produces.

Pharmacists Mutual sought a declaratory judgment that Mason and Urgent Care had been engaged in manufacturing of methylprednisolone and argued that Mason had deliberately broken the law, triggering an exclusion to the policy for willful violations of law committed by the policyholder or with his

7

knowledge and consent. It also sought a declaratory judgment that claims concerning the injury or death of three persons -- McGill, Conrad, and Mary Virginia Scyster -- were not covered because they involved bodily injury outside the policy period. After cross-motions for summary judgment, the district court rejected these arguments and granted summary judgment to the defendants who sought it, holding that Mason's conduct did not amount to manufacturing or trigger the illegality exclusion, and that the claims of the defendants who sought summary judgment all involved injuries that occurred during the policy period. Pharmacists Mutual appeals.

II.

Pharmacists Mutual first argues that its policy does not cover the contaminated drug claims against Mason because the policy contains an exclusion for "[d]amages caused by your willful violation of a regulation or statute pertaining to the practice of pharmacy or any other willful violation of a penal statute or ordinance committed by you or with your knowledge and consent." Under the law of South Carolina that the parties agree applies, exclusions must be interpreted narrowly, Boggs v. Aetna Cas. & Sur. Co., 252 S.E.2d 565, 568 (S.C. 1979), and ambiguities interpreted in favor of the insured, Gaskins v. Blue Cross-Blue Shield of S.C., 245 S.E.2d 598, 602 (S.C. 1978). When a policy is capable of more than one reasonable interpretation, courts adopt the

8

construction most favorable to the insured. Id. The insurer bears the burden of establishing that an exclusion applies. Boggs, 252 S.E.2d at 568.

The parties both interpret the exclusion for "willful" violations to require an intent to violate the law. See Brief of Appellees at 14; Brief of Appellant at 13 n.8. This reflects South Carolina decisions that define a willful act as "one done voluntarily and intentionally with the specific intent to do something the law forbids, or with the specific intent to fail to do something the law requires to be done, that is to say, with bad purpose either to disobey or disregard the law." In re Diggs, 544 S.E.2d 632, 632 (S.C. 2001) (internal quotations omitted). Since Mason was the policyholder, Mason must have either intended to break the law or have known and consented to a willful violation by another person in order for the exclusion to apply.

Pharmacists Mutual has not presented evidence to avoid summary judgment on the applicability of this exclusion. In this case, Pharmacists Mutual presented evidence that Mason violated the South Carolina Pharmacy Practice Act, but no evidence supporting an inference that Mason broke the law deliberately. The only evidence bearing directly upon intent is Mason's testimony that he believed Urgent Care had been compounding methylprednisolone, not manufacturing it, and Mason's testimony that the pharmacy's owner, W. Ray Burns, told Mason and other employees that he wanted the

company to be in full legal compliance and held meetings and briefings to educate his pharmacists about the requirements of law. No pharmacist, doctor, or investigator suggested that Mason -- or anyone else at the pharmacy -- knew that he was violating the law, let alone that he intended to do so.

Mason's violations of South Carolina's pharmacy laws are not by themselves a sufficient basis to find that the violations were committed "voluntarily and intentionally with the specific intent to do something the law forbids." Id. (internal quotations omitted). The state's statutory scheme is intricate. The South Carolina Pharmacy Practice Act regulates matters from alkaloids to veterinarians. See generally S.C. Code Ann. § 40-43-10 et seq. (2001). It does not simply require safety and cleanliness, but dictates hand-washing procedures, id. § 40-43-86(A)(16)(j) ("[A]ll pharmacists, before compounding prescriptions . . . shall thoroughly cleanse their fingernails . . . "), signage, id. § 40-43-86(A)(14) (stating when pharmacy department is closed or licensed pharmacist is absent pharmacy must display "a sign stating 'Pharmacy Department Closed, Pharmacist Not On Duty'"), and scent, id. § 40-43-86(A)(16)(a) (stating pharmacy must eliminate "obnoxious odors" in the prescription department). Its numerous, detailed provisions, some susceptible to multiple interpretations, create the possibility of violations by mistake or

10

misinterpretation, as well as accidental violations by those who understood the law's requirements.

Given the ease of inadvertent violation, the leap from a bare violation to a conclusion of willfulness is too speculative for a reasonable finder of fact. Such a jump not only threatens to strip the willfulness limitation of meaning. It also interprets an exclusion that is written to cover a narrow subset of violations in a manner that renders uncertain the central protection that insurance provides, as a shield against liability for negligent acts. Pharmacists Mutual could write an exclusion applicable to any illegal act, but it did not do so, and the narrower exclusion that it wrote covering willful illegal acts should not be treated as identical to the broader exclusion the insurer chose not to write.

Pharmacists Mutual would give its narrowly drafted exclusion even greater scope through its argument that willfulness can be established from the fact that Urgent Care's owner, W. Ray Burns, sought to significantly increase the amount of Urgent Care's compounding work, because the sale of compounded medications was more profitable than the sale of other drugs. This fact by itself is of limited relevance, because the exclusion requires that Mason, the policyholder, intended to violate the law or knew of and consented to a willful violation. But Burns' desire to foster his most profitable line of business is unremarkable in any event: It

11

would be noteworthy if Burns did <u>not</u> wish to increase his business'
focus on its most profitable line of work. There is no evidence
suggesting Burns sought to serve this end by willfully violating
state statutes, thereby jeopardizing his company's ability to do
business at all. To the contrary, while Pharmacists Mutual seeks
to place a sinister cast on the fact that Urgent Care "obtained
licenses in 50 states" for its compounding, this evidence hardly
suggests that the company sought to pursue its expansion
unlawfully.

In sum, we find no basis in the record that could adequately
support excluding coverage based upon willful illegal conduct by
Mason. While the district court did not hold a hearing prior to
its grant of summary judgment, "[t]here is no absolute requirement
that a ruling on a motion for summary judgment be preceded by a
hearing." <u>Cray Commc'ns, Inc. v. Novatel Computer Sys., Inc.</u>, 33
F.3d 390, 396 (4th Cir. 1994). The insurer does not suggest that
the company was prevented from putting relevant information into
the record. The company had ample opportunity to offer evidence to
meet its burden, and simply failed to do so.

III.

Pharmacists Mutual next contends that it is not liable for
damages from the contaminated methylprednisolone because the drugs
were manufactured, rather than compounded. Mason's policy does not

12

cover manufacturing, which it defines to include "the preparation and promotion of commercially available products from bulk compounds for resale . . ." as well as the "promotion and marketing" of certain drugs. In contrast, the policy covers the compounding of medications, including "the preparation, mixing, assembly, packaging, or labeling of a drug . . . as a result of a practitioner's prescription drug order or initiative based on the practitioner/patient/pharmacist relationship in the course of professional practice" and "the preparation of drugs or devices in anticipation of prescription drug orders based on routine, regularly observed prescribing patterns." Compounding also includes "such other practices as are approved as a part of the practice of pharmacy by the Board of Pharmacy in the state in which you practice."

We agree with the district court that Mason and Urgent Care's production and distribution of methylprednisolone constituted permissible compounding under these definitions, rather than manufacturing. There was evidence that Mason and Urgent Care had produced two urological drugs -- Bimix and Trimix -- which physicians resold for use outside their practices, and that this would constitute manufacturing. But the Board did not find evidence that Urgent Care's methylprednisolone was used outside physicians' offices and it did not conclude that Mason or Urgent Care had manufactured the painkiller based upon any other

13

consideration.  Pharmacists Mutual has offered no evidence in this proceeding that methylprednisolone was resold or administered outside physicians' offices or medical institutions.  And we find unavailing its arguments that even though the Board made no finding that Urgent Care manufactured methylprednisolone, this Court should make such a finding on its own.

A.

Pharmacists Mutual argues that Mason and Urgent Care were engaged in manufacturing by making drugs "in anticipation of receiving prescriptions without a historical basis," S.C. Code Ann. § 40-43-86(CC)(2)(f), but it does not offer evidence that the pharmacy lacked a historical basis for any of its compounding of methylprednisolone.  Under Mason's policy, compounding includes both the preparation of drugs "as a result of a practitioner's prescription drug order" and "the preparation of drugs or devices in anticipation of prescription drug orders based on routine, regularly observed prescribing patterns."  South Carolina law similarly distinguishes manufacturing, which includes the preparation of drugs without a historical basis, id., from compounding, which includes "the preparation of drugs or devices in anticipation of prescription drug orders based on routine, regularly observed prescribing patterns," id. § 40-43-30(7).  All the testimony in this case indicated that Mason and Urgent Care's

14

production of methylprednisolone fit within the compounding definition. Mason and Sheila Young, the Board's manager of regulatory compliance, testified that the doses of methylprednisolone that Urgent Care compounded were either supported by a prescription order that the pharmacy had received at the time of compounding or by historical prescription patterns.

Pharmacists Mutual nevertheless argues that the historical basis for some compounding was deficient. It notes that when new customers placed their first orders, Urgent Care sometimes fulfilled the orders using drugs that had been prepared previously. For instance, Urgent Care fulfilled an order for methylprednisolone from the Johnston Pain Clinic on February 25, 2002 using drugs that were compounded on February 6, 2002, even though the Johnston Pain Clinic had not previously ordered methylprednisolone from the pharmacy. Similarly, Urgent Care used drugs from the February 6 lot to fulfill orders from two subsequent new customers, Dr. Robert Feldman and Dr. Thomas A. Duc. These facts are not relevant, however, because they do not contradict Mason and Young's testimony that Urgent Care's compounding had a historical basis in prescription data, even if the historical basis was derived from different physicians than those who ultimately received the compounded drugs. Neither the policy nor South Carolina law require that the historical basis supporting compounding be derived from the practitioner who ultimately receives the batch in

15

question, and as a result, the acts to which Pharmacists Mutual points do not indicate that Mason or Urgent Care engaged in manufacturing.

B.

Pharmacists Mutual claims that even if Mason and Urgent Care had a historical basis for their production of methylprednisolone, they engaged in manufacturing because they distributed methylprednisolone to doctors for in-office or institutional use without knowing the identities of the patients treated in these settings. Pharmacists Mutual's policy states that compounding includes "practices . . . approved as a part of the practice of pharmacy by the Board of Pharmacy in the state in which you practice," but the insurer argues that South Carolina does not treat a pharmacy's production or distribution of drugs as compounding if the pharmacy does not have a prescription drug order that identifies a particular patient. The insurer relies upon the South Carolina Pharmacy Practice Act provision that "[t]he compounding of drugs in anticipation of receiving prescriptions without a historical basis or the distribution of compounded products without a patient/practitioner/pharmacist relationship is considered manufacturing." S.C. Code Ann. § 40-43-86(CC)(2)(f).

South Carolina Board of Pharmacy officials explained in depositions, however, that this provision of state law did not bar

16

the production of methylprednisolone for physicians' in-office use, based upon a history of past orders, and we do not read the state's statutes to indicate otherwise. While the Pharmacy Practice Act provides that "the distribution of compounded products without a patient/practitioner/pharmacist relationship is considered manufacturing," id., it does not define the patient/practitioner/pharmacist relationship. It is by no means self-evident that this relationship is absent when a physician has relationships with both a patient and a pharmacist and obtains medications from the pharmacist for in-office administration, as Jeffrey Gibbs, a longtime food and drug lawyer who has served as associate and chief counsel for enforcement at the Food and Drug Administration, noted in a deposition.

Several specific code provisions suggest, to the contrary, that state officials were correct that the provision concerning the "patient/pharmacist/physician relationship" does not require prescription orders naming individual patients when a pharmacy produces drugs on the basis of historical data, for physicians' in-office administration. South Carolina's Pharmacy Practice Act repeatedly indicates that a history of prior orders can be an adequate basis for the compounding of medications -- and thus indicates that compounding can occur in the absence of a drug order for a particular named patient. See S.C. Code Ann. § 40-43-30(7) ("Compounding also includes the preparation of drugs or devices in

17

anticipation of prescription drug orders based on routine, regularly observed prescribing patterns."); id. 40-43-86(CC)(2)(d) ("Pharmacists may compound drugs before receiving a valid prescription based on a history of receiving valid prescriptions that have been generated solely within an established pharmacist/patient/practitioner relationship.").

State officials also emphasized a provision that appears to countenance compounding in the very circumstances of this case. The Pharmacy Practice Act states that "pharmacists may compound products based on an order from a practitioner for use by practitioners for patient use in institutional or office settings." Id. § 40-43-86(CC)(2)(e). The Board's director, Lee Ann Bundrick, its manager of regulatory compliance, Sheila Young, and the investigator Eddie Durant each stated that in the context of in-office or institutional use, a pharmacist may compound drugs based upon a physician's order without the pharmacist's knowing the identities of the patients for whom the drugs were intended. We need not decide whether the provision on in-office use is an independent authorization of the compounding that it describes, as some Board officials suggested, or simply a confirmation that production of drugs that already qualified as compounding remains so. On either reading, we find no basis to dispute the apparent conclusion of the state officials charged with the Pharmacy Practice Act's implementation that Mason and Urgent Care's

18

production of methylprednisolone was compounding under state law. As a result, Mason and Urgent Care's production of methylprednisolone also qualified as compounding under Pharmacists Mutual's policy, which incorporated the state's compounding definition.

C.

Finally, we find no merit in Pharmacists Mutual's argument that drug contamination claims against Mason are not covered because Urgent Care engaged in promotion or marketing. Promotion and marketing of certain drugs are not covered activities under Mason's policy, because the policy states that manufacturing includes "the promotion and marketing of such drugs." The policy does not define "promotion" or "marketing," however, or otherwise illuminate what separates these activities from the communications between pharmacist and doctor that are necessary to create and transmit a prescription drug order. Interpreting these ambiguous terms liberally in Mason's favor and against Pharmacists Mutual, Gaskins, 245 S.E.2d at 600, we cannot commit the leaps that would be necessary to bring Mason's activities within the "promotion" or "marketing" categories.

In order to find that Mason's activities amounted to "promotion" or "marketing," we would have to read the undefined terms to sweep beyond South Carolina law, which differentiates

19

between compounding and manufacturing communications with a precision absent from the insurer's policy. The state's Pharmacy Practice Act provides, "Compounding pharmacies/pharmacists may advertise or otherwise promote the fact that they provide prescription compounding services . . . when requested; however, they may not solicit business by promoting to compound specific drug products, e.g., like a manufacturer." S.C. Code Ann. § 40-43-86(CC)(2)(e).

The record contains no evidence that Urgent Care's activities with respect to methylprednisolone would render them "manufacturing" under this provision. Urgent Care had a full-time sales and marketing employee, Douglas Pait, who met with representatives of the practices that received contaminated drugs. Pait testified, however, that he did not mention methylprednisolone to members of those practices until they inquired as to whether Urgent Care could compound the drug for them. No doctor testified to the contrary. And while Urgent Care hired a telemarketer, had a website, paid commissions to affiliated nurses and physicians, and described the company's compounding practices and some drugs it could provide in printed literature, Pharmacists Mutual has produced no evidence that methylprednisolone was identified in the printed materials or was compounded pursuant to any telemarketing promotion or commission agreement. In sum, the record does not contain evidence that Urgent Care or its employees sought to

20

promote the "specific drug product[]" of methylprednisolone, triggering the definition of manufacturing under South Carolina law, rather than simply "promot[ing] the fact that they provide prescription compounding services" in their communications with the practices. Id.

IV.

Lastly, we affirm the district court's holding that the claims of all of the defendant-appellees are covered under Pharmacists Mutual's policy, even though three defendant-appellees received methylprednisolone that was compounded and injected before the policy period of June 19, 2002 to June 19, 2003. The policy states that the insurer will pay "damages because of an occurrence, personal injury, or advertising injury to which this insurance applies, and arising out of your rendering or failure to render pharmacy services." "Occurrence" is defined as "an act of rendering or failure to render pharmacy services which results in bodily injury or property damage . . . during the policy period" and as "an accident, including a continuous or repeated exposure to conditions . . . ."

South Carolina precedent is squarely on point concerning the interpretation of such an occurrence policy, and establishes that Pharmacists Mutual's policy covers all damage that occurred during the policy period even if the compounding and the injections

21

leading to the damage occurred before the policy took effect.  The South Carolina Supreme Court interpreted virtually identical policy language in <u>Joe Harden Builders, Inc. v. Aetna Cas. & Sur. Co.</u>, 486 S.E.2d 89 (S.C. 1997), and "adopted a modified continuous trigger theory for determining when coverage is triggered under a standard occurrence policy," <u>Century Indem. Co. v. Golden Hill Builders, Inc.</u>, 561 S.E.2d 355, 357 (S.C. 2002).  "Under this theory, coverage is triggered whenever the damage can be shown in fact to have first occurred . . . and the policy in effect at the time of the injury-in-fact covers all the ensuing damages."  <u>Joe Harden</u>, 486 S.E.2d at 91.  Coverage is triggered continuously while damage progresses thereafter, <u>id.</u>, because an occurrence policy "clearly focuses on the time the <u>damage</u> occurs and not on the time of the underlying event that eventually caused the damage," <u>id.</u> at 90.  It is undisputed that all of those who received injections fell ill and suffered damages during the policy period.  Their claims are therefore covered by Pharmacists Mutual's policy.

Pharmacists Mutual seeks to distinguish <u>Joe Harden</u> and <u>Century Indemnity</u>, but these attempts are unpersuasive.  The insurer argues that "the facts in the case at hand are quite distinct from the situation facing the court" in <u>Joe Harden</u> and <u>Century Indemnity</u>, because those cases involved property damage rather than bodily injury and because the time of the harm-causing act in those cases was more difficult to ascertain than in the case at hand.  Brief of

22

Appellant at 43.  Neither Joe Harden nor Century Indemnity relied on the facts upon which Pharmacists Mutual focuses, however.  Joe Harden framed its subject broadly, as "coverage under an occurrence policy when there is progressive damage that is not apparent at the time of the underlying injury-causing event," 486 S.E.2d at 90, and it cited approvingly a case involving a policy covering bodily injury from asbestos, rather than merely property damage, id. at 91 (citing Abex Corp. v. Md. Cas. Co., 790 F.2d 119 (D.C. Cir. 1986)).  In addition, Joe Harden stated that one reason underlying its continuous-trigger rule was that "this theory of coverage will allow the allocation of risk among insurers when more than one insurance policy is in effect during the progressive damage," id., a rationale that applies with equal force to progressive injuries caused by compounded medications.  Under South Carolina case law, Pharmacists Mutual's policy covers claims based upon progressive damage that occurred during the policy period even if the actions causing the harm occurred before the policy took effect, and we therefore find the claims of all the defendant-appellees to be covered.

V.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

23