IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2023 Term

_____

No. 22-848

_____

FILED

**November 8, 2023**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

WESTFIELD INSURANCE COMPANY,
Petitioner,

v.

SISTERSVILLE TANK WORKS, INC.;
ROBERT N. EDWARDS;
E. JANE PRICE, Individually and as Executrix of the
Estate of Robert G. Price, deceased;
DOUGLAS L. STEELE; CAROL STEELE;
GARY THOMAS SANDY; PEGGY P. SANDY;
REAGLE & PADDEN, INC.; and DAVID C. PADDEN,
Respondents.

_____

Certified Question from the
United States Court of Appeals for the Fourth Circuit
The Honorable Diana Gribbon Motz, Senior Circuit Judge
Appeal No. 20-2052

CERTIFIED QUESTION ANSWERED

_____

Submitted: October 11, 2023
Filed: November 8, 2023

Brent K. Kesner, Esq.
Ernest G. Hentschel, II., Esq.
KESNER & KESNER, PLLC
Charleston, West Virginia
Counsel for the Petitioner

Patrick S. Casey, Esq.
Sandra M. Chapman, Esq.
Ryan P. Orth, Esq.
CASEY & CHAPMAN, PLLC
Wheeling, West Virginia
Counsel for Respondent Sistersville Tank
Works, Inc.

David B. Lunsford, Esq.
HARTLEY LAW GROUP, PLLC
Wheeling, West Virginia
Counsel for Respondents Robert N.
Edwards; E. Jane Price, individually and
as executrix of the Estate of Robert G.
Price; and Douglas and Carol Steele

Todd A. Mount, Esq.
SHAFFER & SHAFFER PLLC
Madison, West Virginia
Courtney C.T. Horrigan, Esq.
Dominic I. Rupprecht, Esq.
Zachary S. Roman, Esq.
REED SMITH LLP
Pittsburgh, Pennsylvania
Counsel for Amicus Curiae United
Policyholders

**JUSTICE HUTCHISON delivered the Opinion of the Court.**

**JUSTICE ARMSTEAD dissents and reserves the right to file a separate opinion.**

**SYLLABUS BY THE COURT**

1.      "An insurance policy which requires construction must be construed liberally in favor of the insured."  Syl. pt. 3, *Polan v. Travelers Ins. Co.*, 156 W. Va. 250, 192 S.E.2d 481 (1972).

2.      "A de novo standard is applied by this Court in addressing the legal issues presented by a certified question from a federal district or appellate court."  Syl. pt. 1, *Light v. Allstate Ins. Co.*, 203 W. Va. 27, 506 S.E.2d 64 (1998).

3.      "Whenever the language of an insurance policy provision is reasonably susceptible of two different meanings or is of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning, it is ambiguous."  Syl. pt. 1, *Prete v. Merchants Prop. Ins. Co. of Indiana*, 159 W. Va. 508, 223 S.E.2d 441 (1976).

4.      "It is well settled law in West Virginia that ambiguous terms in insurance contracts are to be strictly construed against the insurance company and in favor of the insured."  Syl. pt. 4, *Nat'l Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W. Va. 734, 356 S.E.2d 488 (1987).

5.      "Any question concerning an insurer's duty to defend under an insurance policy must be construed liberally in favor of an insured where there is any question about an insurer's obligations."  Syl. pt. 5, *Tackett v. Am. Motorists Ins. Co.*, 213 W. Va. 524, 584 S.E.2d 158 (2003).

6.      A continuous-trigger theory applies to determine when coverage is activated under the insuring agreement of an occurrence-based CGL policy if the policy is ambiguous as to when coverage is triggered.

7.      Under the continuous-trigger theory of coverage, when a claim is made alleging a hidden or progressive injury caused by chemical exposure or other analogous harm, every occurrence-based policy in effect from the initial exposure, through the latency and development period, and up to the manifestation of the bodily injury, sickness, or disease, is triggered and must cover the claim.

**HUTCHISON, Justice**:

The gateway to coverage under every standardized, commercial general liability (or "CGL") policy issued in the United States since 1966 is proof that a bodily injury or property damage has "occurred." When an injury or property damage occurs at the moment the liability-imposing event takes place, it is easy to conclude that the policy in effect at the time of the event will cover any later-made claims. For many decades, the insurance industry called these instantaneous incidents "boom events."

The instant case presents much more complicated facts that cloud the meaning of occurrence, and it involves claims against a CGL policy alleging that long-term exposure to chemicals caused a disease to develop over an untold number of years before being diagnosed. Both the exposure to the chemicals and the development of the disease happened across numerous CGL policy periods. In these circumstances, a majority of courts have found the occurrence provisions in CGL policies to be ambiguous regarding when coverage is triggered and which policies might be required to address the claims.

The United States Court of Appeals for the Fourth Circuit certified a question to this Court asking how West Virginia courts assess when a long-developing, hidden injury arising from long-term causes "occurs" under the insuring clause of a CGL policy. Specifically, the Court of Appeals asks "[a]t what point in time does bodily injury occur to trigger insurance coverage for claims stemming from chemical exposure or other analogous harm that contributed to the development of a latent illness?"

1

After careful review of the language used in the occurrence-based CGL policy, our answer to the question is that a "continuous-trigger" theory applies to the policy, as the policy is ambiguous as to when coverage is triggered. As we discuss below, under the continuous-trigger theory, coverage is triggered when an individual is initially exposed to what the policy calls a "harmful condition" such as a chemical or analogous toxic, injurious substance. Coverage is also triggered when the individual suffers from "exposure in residence," that is, the development period after exposure when the injury is latent and hidden. Finally, coverage is triggered when the sickness, disease, or other bodily injury manifests. Under the continuous-trigger theory, damages that are caused, continuous, or progressively deteriorating throughout successive policy periods are covered by all the occurrence-based policies in effect during those periods.[1]

## I. Factual and Procedural Background

Sistersville Tank Works has, since late 1984, been a family-owned and -operated West Virginia corporation. The name "Sistersville Tank Works" dates back to an 1894 entity that supplied the Mid-Ohio Valley region with oil field boilers, tanks, and pressure vessels. By 1984, Janet Wells and her daughter, Darlene Morgan, were the bookkeeper and sales agent, respectively, for a division of Varlen Corporation that operated as Sistersville Tank Works. Wells and Morgan formed Tyler County Tank Works, Inc.,

---

[1] The Court greatly appreciates the brief from amicus curiae United Policyholders.

2

which then purchased the name "Sistersville Tank Works" and the division's assets (but *not* its liabilities) from Varlen Corporation. After the purchase was completed in October 1984, Tyler County Tank took on its current name: Sistersville Tank Works, Inc. ("STW"). Today, STW manufactures, installs, and repairs various types of tanks at industrial sites throughout world, including at several chemical plants in West Virginia.

Beginning on the first day of 1985, STW was protected under a commercial general liability ("CGL") policy it purchased from Westfield Insurance Company ("Westfield"), an Ohio corporation.[2] Westfield thereafter renewed STW's coverage under a series of CGL policies with one-year (or more) coverage periods. STW purchased CGL policies from Westfield for twenty-five years, with the last policy (with extensions) expiring on April 15, 2010.

Apparently, the earliest surviving document showing the terms of those CGL policies dates from January 1988, and is identified as a "renewal" of the policy issued to STW from 1985 to 1988.[3] At issue in this case is the meaning of the "insuring agreement"

---

[2] STW procured its insurance through brokers (Reagle & Padden, Inc., and David C. Padden) who were parties in the federal court action below.

[3] The record indicates that STW produced a certificate of insurance demonstrating Westfield insured STW under a CGL policy and an umbrella policy with a three-year term, from January 1, 1985, to January 1, 1988. STW also produced copies of CGL and umbrella policies marked "renewal" with a policy period January 1, 1988, to April 15, 1989. Westfield produced a series of annually renewed CGL policies effective from April 15, 1989, through April 15, 2010. While we are not asked to examine the language of the umbrella policies, we note that STW argues that the coverage terms of the umbrella policies are comparable to those found in the CGL policies.

3

to Westfield's 1988-89 CGL policy. In the insuring agreement, Westfield promised to provide a legal defense for STW and to pay "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The CGL policy defines a "bodily injury" as a "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." The insuring agreement contained three qualifying clauses:

> This insurance applies only to "bodily injury" and "property damage" which *occurs* during the policy period. The "bodily injury" or "property damage" must be caused by an "*occurrence*." The "*occurrence*" must take place in the "coverage territory."

(Emphasis added.) Finally, the policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

At different points in 2014, 2015, and 2016, three men were diagnosed with various forms of cancer. In 2016 and 2017, the "claimants" (the men with cancer and/or their spouses) sued STW in three separate lawsuits in West Virginia state courts. In each case, the claimants alleged that STW had carelessly manufactured, installed, inspected, repaired, or maintained tanks at a chemical plant in the Mid-Ohio Valley region of West Virginia. The claimants asserted they worked at the plants around STW's tanks for various extended periods between 1960 and 2006, and that they were repeatedly exposed to cancer-

4

causing chemical liquids, vapors, or fumes that escaped from the tanks. The claimants alleged the cancers were, in some part, caused by STW's tanks.[4]

STW asked Westfield to provide a defense and indemnification to the three lawsuits under its previously purchased CGL policies. STW asserted it could become legally obligated to pay damages because the lawsuits alleged toxic exposures that may have happened during the Westfield policy periods. STW also took the position that the lawsuits alleged "latent" diseases under the policies, that is, during the policy periods from 1985 to 2010, the men's cancers may have been "hidden or concealed," "lying dormant or hidden until circumstances [were] suitable for development or manifestation," and otherwise were silently developing. "Latent," *Oxford Dictionary of English* (3d ed. 2010).

Westfield denied coverage under its CGL policies for the three suits and, in June 2018, filed a complaint against STW for declaratory relief in the United States District Court for the Northern District of West Virginia. Westfield generally asserted to the federal court that it had no duty to provide either a defense or indemnification to STW because the state-court claimants were diagnosed four years or more after the expiration of the last CGL

---

[4] The three state-court actions are: *Edwards v. Covestro LLC*, Marshall County Civil Action No. 16-C-32 (alleging Robert N. Edwards worked at the Covestro plant between 1962 and 2001, and was diagnosed with renal cell carcinoma in 2014); *Price v. Sistersville Tank Works, Inc.*, Marshall County Civil Action No. 17-C-62 (alleging Robert G. Price worked at the same plant from 1960 to 1995, and died in 2015 after contracting acute myeloid leukemia); and *Steele v. Axiall, LLC*, Marshall County Civil Action No. 17-C-231 (alleging Douglas L. Steele worked at the Axiall plant between 1968 and 2006, and was diagnosed with chronic lymphocytic leukemia in January 2016).

policy and, therefore, STW could not establish that an "occurrence" had happened within the policy period sufficient to trigger coverage. After discovery, the parties filed competing motions for summary judgment.

In an order dated September 4, 2020, the district court granted a judgment in favor of STW and found Westfield owed STW a duty to defend and to indemnify under all of its policies issued from 1985 through 2010. *Westfield Ins. Co. v. Sistersville Tank Works, Inc.*, 484 F. Supp. 3d 283 (N.D.W.Va. 2020). The district court concluded that Westfield's promise to cover a bodily injury that "occurs during the policy period" was ambiguous in light of the latent disease claims asserted against STW. *Id.* at 296. The district court ruled that the language in Westfield's policy did not clearly identify when coverage was "triggered" in instances where a claimant alleged repeated chemical exposures and the gradual development of a disease over successive policy periods.

This Court has never addressed the question raised before the district court. Nevertheless, the district court calculated that this Court would apply the continuous-trigger theory to clarify the ambiguous language in Westfield's policy. *Id.* at 295. The district court then adopted the following definition of the trigger:

> Under the continuous or multiple trigger theory, each "occurrence-based" CGL and umbrella liability policy insuring the risk from the [] initial exposure through the date of manifestation is triggered. *Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034, 1041 (D.C. Cir. 1981). Under the continuous trigger, "bodily injury" within the meaning of the policies is viewed to include "any part of the single injurious process" from initial exposure, through "exposure in residence" to manifestation.

6

*Id.* at 294. The district court applied the trigger to construe Westfield's policy in reliance upon the axiom that when an insurance company uses ambiguous language in a policy, then the language must be construed in favor of the insured. Syl. pt. 3, *Polan v. Travelers Ins. Co.*, 156 W. Va. 250, 192 S.E.2d 481 (1972). Specifically, the district court ruled that coverage was triggered under the 1988-89 CGL policy, and that Westfield had both a duty to defend and a duty to indemnify STW against the underlying state law court actions. Moreover, the district court extended its analysis to the other Westfield policies issued to STW between 1985 and 2010 and found coverage was triggered under each of these policies too. *Id.* at 297.

Westfield appealed the ruling to the United States Court of Appeals for the Fourth Circuit. Before the Court of Appeals, Westfield asserted that the district court's adoption of the continuous-trigger theory was in error and that, instead, a "manifestation" trigger of coverage should be applied. Under the manifestation trigger, the meaning of "occurrence" is limited to a single, temporal point, and a policy is construed narrowly (and usually in favor of the insurer) to limit coverage. The manifestation trigger provides that only the CGL policy in effect when an injury is diagnosed, discovered, or manifested covers the claim. Under this theory, Westfield would be relieved of its responsibilities under the CGL policies because the claimants' diseases became manifest after the last CGL policy expired.

Like the district court, the Court of Appeals acknowledged that this Court has not yet addressed the question of when a latent bodily injury, sickness, or disease occurs

7

under an occurrence-based CGL policy so as to trigger coverage. *Westfield Ins. Co. v. Sistersville Tank Works, Inc.*, No. 20-2052, 2022 WL 16911994, at *2-3 (4th Cir. Nov. 14, 2022). Accordingly, the Court of Appeals certified the following question to this Court:

> At what point in time does bodily injury occur to trigger insurance coverage for claims stemming from chemical exposure or other analogous harm that contributed to development of a latent illness?

*Id.* at *1. On March 31, 2023, we agreed to review the certified question.

## II. Standard of Review

"A de novo standard is applied by this Court in addressing the legal issues presented by a certified question from a federal district or appellate court." Syllabus Point 1, *Light v. Allstate Ins. Co.,* 203 W. Va. 27, 506 S.E.2d 64 (1998).

## III. Discussion

Occurrence-based CGL policies provide coverage if the event insured against takes place during the policy period, irrespective of when a claim is presented.[5] For traditional claims that are limited in time, place, and space (like claims arising out of fires, explosions, collisions, or natural disasters), parties usually have little difficulty identifying the date on which the injury or property damage "occurred" and took place. *See generally*,

---

[5] While an "occurrence" policy protects an insured from liability for any damages insured against while the policy is in effect, a "claims made" or "discovery" policy is the opposite: coverage is triggered by the presentation of a claim during the policy term regardless of when the insured-against eventuality took place. *Auber v. Jellen*, 196 W. Va. 168, 174, 469 S.E.2d 104, 110 (1996).

Scott M. Seaman, Jason R. Schulze, *Allocation of Losses in Complex Insurance Coverage Cases* § 2.2 (2023).

The certified question raises a different, more complicated set of circumstances. Here, the federal Court of Appeals asks us to determine what events must happen to trigger coverage under an occurrence-based CGL policy in the context of what is called a "long-tail claim," where "damage or injury may take place over time, and often there is a latency period between the date on which the polluting activity or injurious process begins and the date on which the resulting bodily injury or property damage is discovered." *Id.* The parties in this case offer this Court two different "trigger" theories in an effort to clarify the CGL policy's "occurrence" definition.[6]

On the one hand, Westfield contends that manifestation of a disease is the sole trigger of coverage under its occurrence-based CGL policies. Focusing on only a few words in its insuring agreement, Westfield argues that its policy clearly requires a "bodily injury" like a disease to "occur[] during the policy period." Under Westfield's position, a

---

[6] To be clear,

> [t]he phrase "trigger of coverage" is not contained in the insurance contract, but rather is a phrase coined to refer to the issue of which insurance contract or contracts must respond to an otherwise covered claim for property damage or bodily injury that arguably takes place in one or more contract periods.

Seaman, *Allocation of Losses in Complex Insurance Coverage Cases* at § 2.2.

9

claimant's disease can be said to occur only when the disease was first diagnosed, that is, when it became manifest. Hence, only the policy in effect at diagnosis is triggered to cover the claim.

On the other hand, STW takes the position that the occurrence language incorporates a "continuous" trigger theory of coverage.[7] STW's argument encompasses the entirety of Westfield's insuring agreement. STW points out that, by definition, an "occurrence" under Westfield's policy includes "continuous or repeated exposure" to a "harmful condition[]" that results in "bodily injury, sickness or disease." STW argues the policy should be interpreted to mean a progressive bodily injury, sickness, or disease occurs continuously, from the time of the initial exposure to a harmful substance, through any repeated exposures, and finally to the development, progression, manifestation, and discovery of the injury, sickness, or disease. Hence, coverage is triggered continuously during each phase, from first exposure to progression to final manifestation, and every policy in effect between exposure and manifestation must cover the injury.[8]

---

[7] The continuous trigger is sometimes called the "multiple-trigger" theory. *See, e.g.*, *J.H. France Refractories Co. v. Allstate Ins. Co.*, 626 A.2d 502, 507 (Pa. 1993) (adopting "the so-called multiple-trigger theory of liability"). It is sometimes also called the "triple-trigger" theory. Pat Magarick, Ken Brownlee, 2 Casualty Insurance Claims § 27:5 (4th ed. 2023) ("In effect, the triple-trigger theory holds that coverage is in order in an occurrence policy from the time of first exposure, through the period when the disease becomes manifested, and thereafter.").

[8] The district court briefly mentioned two other trigger-of-coverage theories: the exposure trigger ("the bodily injury is deemed to have occurred during the policy period whenever the claimant has been shown to have been exposed to a harmful substance"); and

Continued . . .

10

We begin with our standard guides for construing insurance policies to assess whether the insuring clause of Westfield's CGL policy is ambiguous. In West Virginia, the analysis of the terms in an insurance policy is controlled by the rules of construction that are applicable to contracts generally. "Where the provisions of an insurance policy contract are clear and unambiguous they are not subject to judicial construction or interpretation, but full effect will be given to the plain meaning intended." Syllabus, *Keffer v. Prudential Ins. Co. of Am.*, 153 W. Va. 813, 172 S.E.2d 714 (1970). To the extent possible, courts are to "ascertain the meaning of the policy as manifested by its language." *Payne v. Weston*, 195 W. Va. 502, 507, 466 S.E.2d 161, 166 (1995).

However, "[w]henever the language of an insurance policy provision is reasonably susceptible of two different meanings or is of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning, it is ambiguous." Syl. pt. 1, *Prete v. Merchants Prop. Ins. Co. of Indiana*, 159 W. Va. 508, 508, 223 S.E.2d 441, 442 (1976). If the provisions of an insurance policy establishing the insurer's duty to indemnify are ambiguous or conflicting, then the provisions are to be construed against the insurer and in favor of the insured. "It is well settled law in West Virginia that ambiguous

---

the "injury-in-fact" trigger ("the claimant must suffer an actual injury during the policy period for the claim to be covered"). *Westfield Ins. Co*, 484 F. Supp. 3d at 294. Neither party argues for the adoption of these theories. Moreover, only a minority of courts have adopted these theories in the context of bodily injuries. *See, e.g.*, Seaman, *Allocation of Losses in Complex Insurance Coverage Cases* at Appendix C: 50 State Survey of Trigger of Coverage Decisions (indicating only eight states apply an exposure trigger and only five states apply an injury-in-fact trigger). Hence, we need not discuss them further.

11

terms in insurance contracts are to be strictly construed against the insurance company and in favor of the insured." Syl. pt. 4, *Nat'l Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W. Va. 734, 356 S.E.2d 488 (1987). Likewise, "[a]ny question concerning an insurer's duty to defend under an insurance policy must be construed liberally in favor of an insured where there is any question about an insurer's obligations." Syl. pt. 5, *Tackett v. Am. Motorists Ins. Co.*, 213 W. Va. 524, 584 S.E.2d 158 (2003). *See also*, *Aetna Cas. & Sur. Co. v. Pitrolo*, 176 W. Va. 190, 194, 342 S.E.2d 156, 160 (1986) (same). Stated simply, "any ambiguity in the language of an insurance policy is to be construed liberally in favor of the insured, as the policy was prepared exclusively by the insurer. This principle applies to policy language on the insurer's duty to defend the insured, as well as to policy language on the insurer's duty to pay." *Horace Mann Ins. Co. v. Leeber*, 180 W. Va. 375, 378, 376 S.E.2d 581, 584 (1988). *See also*, *Pitrolo*, 176 W. Va. at 194, 342 S.E.2d at 160 ("We have long recognized that since insurance policies are prepared solely by insurers, any ambiguities in the language of insurance policies must be construed liberally in favor of the insured.").

It is evident from the parties' competing positions that the meaning of the policy's insuring agreement is uncertain or doubtful in the context of latent or progressive diseases, as the parties have shown the occurrence language used is susceptible to at least two plausible constructions. Moreover, as we discuss in greater detail below, history shows that the drafters of the occurrence provisions used in CGL policies deliberately chose

12

broad, but vague, language meant to cover future, unforeseen events.[9]  Likewise, here, the occurrence and bodily injury provisions that Westfield chose to incorporate into its insuring agreement fail to precisely articulate a trigger of coverage.  They are, therefore, ambiguous.

STW invokes the aforementioned, well-established rule that courts are to resolve ambiguities in insurance contracts in favor of the insured and against the insurer.  As we discuss below, we agree with the interpretation favorable to STW that the ambiguous policy language incorporates a continuous trigger, and we do so for the following reasons.

1.    *The history behind the 1966 CGL Policy and the adoption of "occurrence" language*: We start our reasoning with the history of the insurance industry's decision to first incorporate "occurrence" language into the standard CGL policy in 1966.  The policy's drafters left us with a bevy of interpretive literature, including memoranda, committee reports, notes, articles, and sworn testimony to explain their decisions.[10]  The

---

[9] *See generally*, John P. Arness, Randall D. Eliason, *Insurance Coverage for "Property Damage" in Asbestos and Other Toxic Tort Cases*, 72 Va. L. Rev. 943, 949 (1986) ("A contract of insurance written to cover future unknown events cannot speak in anything but general terms.  One can always claim that such a document is 'ambiguous' in a complex fact situation—if predisposed to do so—because language meant to cover unforeseen events is inherently capable of more than one interpretation.").

[10] "Most courts and commentators have recognized . . . that the presence of standardized industry provisions and the availability of interpretative literature are of considerable assistance in determining coverage issues.  Such interpretative materials have been widely cited and relied on in the relevant case law and authorities construing standardized insurance policy language." *Montrose Chem. Corp. v. Admiral Ins. Co.*, 913 P.2d 878, 891 (Cal. 1995) (citation omitted).  Stated more succinctly, Justice Holmes once said that "a page of history is worth a volume of logic." *New York Tr. Co. v. Eisner*, 256 U.S. 345, 349 (1921).

drafters crafted occurrence language, like that used by Westfield, to accomplish two goals: to focus coverage decisions on the occurrence of a bodily injury or property damage, rather than on the liability-inducing conduct; and to afford insureds coverage for bodily injury or property damage sustained as a result of gradual processes resulting from repeated or continuous exposures to harmful substances. If the insured loss happened repeatedly or continuously across more than one policy period, the drafters of the CGL policy intended for all of the affected policies to provide coverage. In other words, the drafting history of the occurrence-based CGL policy leads us to find the language incorporates a continuous trigger.

The insurance industry first developed standardized language for CGL policies in 1940, and the early policies employing that language provided coverage for bodily injury "caused by accidents which occur during the policy period." Marcy Louise Kahn, *Looking for "Bodily Injury": What Triggers Coverage Under a Standard Comprehensive General Liability Insurance Policy*, 19 Forum 532, 533 (1983).[11] The focus of this insuring language was on whether an "accident" happened during the effective dates of the policy. However, "[t]his language . . . produced confusion over whether an 'accident' was confined to a single, sudden event, or whether it included bodily injury

---

[11] "In 1940, in response to a nudge from state insurance regulators, two insurance company trade groups released the first comprehensive general liability form. This constituted a major breakthrough for businesses. . . . Since 1940, CGL coverage has come to be the most common type of liability policy for businesses." Timothy Stanton, *Now You See It, Now You Don't: Defective Products, the Question of Incorporation and Liability Insurance*, 25 Loy. U. Chi. L.J. 109, 112 (1993).

resulting from gradual or repeated exposures to deleterious conditions." *Id.* "Beginning in the 1940s, a number of courts had construed the word 'accident' in CGL policies to include not only instantaneous events, but gradual processes as well; others construed the word narrowly to include only instantaneous events, referred to in the contemporaneous insurance industry documents as 'boom events.'" Eugene Anderson, Jordan S. Stanzler, Lorelie S. Masters, *Insurance Coverage Litigation* 190-91 (John Wiley & Sons, 1997).

Due to this confusion, two insurance industry trade groups (the Mutual Insurance Rating Bureau and the National Bureau of Casualty Underwriters)[12] established several committees with the goal of creating a standardized CGL policy that, among other things, revised and clarified the "accident" language. In 1966, after "7 years of research, conferences, and consultations," the committees produced a standard CGL policy with numerous reforms. Willard J. Obrist, *New Comprehensive General Liability Insurance Policy*, DRI at 5 (Nov. 1966). While the standard CGL policy has seen some changes since 1966, these initial reforms are still used in CGL policies issued today, including the Westfield policy language at issue in this case.

---

[12] These organizations are the predecessors to the Insurance Services Office ("ISO"), the organization that now provides policy forms and drafting services to "most of the P&C [property and casualty] insurance providers in the U.S." Verisk Analytics, Annual Report (Form 10-K) at 5 (Feb. 28, 2023). Most carriers use the basic ISO forms, at least as the starting point for their general liability policies. *See generally, New Castle Cnty. v. Hartford Acc. & Indem. Co.*, 933 F.2d 1162, 1181 (3d Cir. 1991).

One of the most significant reforms in the 1966 CGL Policy was that the insuring provisions were redesigned "to afford coverage on an occurrence basis" rather than on an "accident" basis.[13]  *Id.* at 6.    "[B]odily injury or property damage that takes place during the policy period triggers the insurance company's promise to pay[.]" Anderson, *Insurance Coverage Litigation* at 184.[14]    Hence, "for the purposes of determining the trigger of coverage, what mattered was the result of the occurrence, not the cause." *Id.* at 195.[15]

---

[13] The 1966 version of the standard CGL policy adopted the following insuring language:

> [The] company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, *caused by an occurrence. . . .* "[O]ccurrence" means an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage . . .

Kahn, *Looking for "Bodily Injury*," 19 Forum at 534 (emphasis added).  *Accord*, Norman Nachman, *The New Policy Provisions for General Liability Insurance*, 18 The CPCU Annals 197, 199 (1965).

[14] As one drafter of the 1966 CGL policy wrote: "The policy will not depend upon the causative event of occurrence but will be based upon injuries or damages which result from such event and which happened during the policy period.  It will not be material whether the causative event happened during or before the policy period."  Obrist, DRI at 6.

[15] *Accord* John J. Tarpey, *The New Comprehensive Policy: Some of the Changes*, 33 Ins. Counsel J. 223, 224 (Apr. 1966) ("It will now be required, to bring the policy provisions into play, that the bodily injury or property damage resulted during the policy period and not that the accident resulted during the policy period.  This should remove problems of interpretation where causative factors operate over a long period of

Continued . . .

Moreover, the "change in terminology made clear the intent of insurers to provide coverage for insidious diseases." *Am. Home Prod. Corp. v. Liberty Mut. Ins. Co.*, 565 F. Supp. 1485, 1489 (S.D.N.Y. 1983). Three different contemporaneous articles written by drafters of the 1966 CGL policy indicate their intent for the "occurrence" language to encompass injuries that developed across multiple policy periods; every drafter indicated that every policy under which some part of the injury occurred would cover the claim. For instance, the secretary of the National Bureau noted that the 1966 policy's "occurrence" definition

> eliminates any requirement that the injury result from a sudden event. Although it is most common that the injury take place simultaneously with the exposure, *there are many instances of injuries taking place over an extended period of time before they become evident. For example, slow ingestion of foreign substances or inhalation of noxious fumes*. In cases such as these, the definition of occurrence serves to identify the time of loss for the purpose of applying coverage – the injury must take place during the policy period.

---

time before any harm results and also where the negligent act or the operative legal act is far removed in time from the happening of the injury (e.g., a defect in manufacture, the sale of the product); John M. Sylvester, John M. Hagan, *Pennsylvania's Trigger of Coverage for Continuous Property Damage Liabilities: Confirming the "Continuous Trigger" for Latent Environmental Claims*, 53 Tort Trial & Ins. Prac. L.J. 103, 110-11 (2017) ("[T]he policy language makes clear that damage during the policy period is what triggers coverage under the historical occurrence-based CGL policies. It does not matter when the accident or exposure that causes the damage has taken place as long as the resulting damage happens during the policy period. Likewise, the language does not refer to manifestation or discovery of damage, meaning that the timing of manifestation is irrelevant to a determination of trigger. By their plain language, historical CGL policies are triggered by damage taking place during the policy period.").

17

Richard H. Elliott, "The New Comprehensive General Liability Policy," *Best's Fire and Casualty News* at 32 (February 1966) (emphasis added). Mr. Elliott (and two other drafters, Norman Nachman and Willard J. Obrist) made clear the drafters' intent that the "slow ingestion of foreign substances or inhalation of noxious fumes" could result in a bodily injury that occurred continuously over time and across multiple policy periods.[16] Importantly, in some fashion, the three drafters expressed that, "In some exposure types of cases involving cumulative injuries, it is possible that more than one policy will afford coverage. Under these circumstances, each policy will afford coverage to the bodily injury or property damage which occurs during the policy period." *Id.*[17]

The conclusion to be drawn from these contemporaneous explanations of the meaning of "occurrence" is that a CGL policy provides coverage for gradual bodily injury and property damage. Further, those gradual injuries or damages would be encompassed by the language of the CGL policy, even if they progressed over a substantial period of time before they became manifest. Anderson at 193. Most importantly, "[f]rom the

---

[16] *See also* Nachman, 18 The CPCU Annals at 199-200 ("The slow ingestion of foreign matters and inhalation of noxious fumes are examples of injuries of this kind."); Obrist, DRI at 6 ("[T]here are many instances in which injuries take place over an extended period before they become evident as in slow ingestion of foreign substances or inhalation of noxious fumes.")

[17] *See also* Nachman, 18 The CPCU Annals at 199-200 ("This means that in exposure-type cases, cases involving cumulative injuries, more than one policy contract may come into play in determining coverage and its extent under each policy."); Obrist, DRI at 6 (in "exposure cases involving cumulative injuries, it is possible that more than one policy will afford coverage, each to apply to bodily injury or property damage occurring during its policy period.").

perspective of policyholders, one of the most attractive features of the 1966 CGL policy was the fact that in cases involving progressive or repeated injury, multiple policies could be called into play." *Id.* at 195.

In summary, history shows that the "occurrence" language incorporated into the CGL policy was designed with the goal of affording coverage for singular, repeated, or continuous exposures to hazardous substances if those exposures cause either a singular or a progressive bodily injury, sickness, or disease. Under the meaning of "occurrence," bodily injuries can take place continuously and form a "single injurious process" over a succession of policy periods. *Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034, 1047 (D.C. Cir. 1981). Because each progression of a bodily injury constitutes a new occurrence, we perceive that the drafters of the occurrence language used by Westfield intended to incorporate a continuous trigger of coverage.

2. *The drafters of the 1966 CGL Policy rejected the manifestation-trigger theory*: Before settling on occurrence-based language, the drafters considered many other forms of insuring-clause language. Important to our purposes, the drafters examined language that triggered coverage upon manifestation of a loss. "Substantial evidence supports the view that the CGL draftsmen rejected the manifestation theory as a limitation on coverage." *Am. Home Prod. Corp.*, 565 F. Supp. at 1501.

In 1960, an insurance industry drafting committee produced an early draft of what later became the 1966 CGL policy. The 1960 draft incorporated a manifestation

19

trigger that "would deem *all* of the injury to have occurred" at the first manifestation of injury or damage. *Id.* However, by May of 1961, the drafting committee had concluded "that the manifestation trigger was not viable because it would not be possible to 'telescope' into one policy period all damages resulting from a continuous injury." Anderson, *Insurance Coverage Litigation* at 196. Further, after study, the drafting committee "concluded that the time of manifestation probably could not be determined 'precisely.'" *Id.* at 197 (quoting the Joint Forms Committee, "Revised Comprehensive Liability Policy May Draft, Explanatory Memorandum" 292-93 (May 4, 1961, draft)).

Still, the early draft was forwarded to a higher-level committee that, after discussion, dismissed the manifestation language. *Am. Home Prod. Corp.*, 565 F. Supp. at 1501. A drafter of the 1966 CGL Policy, Richard A. Schmalz, later testified that the higher-level committee's decision was "a rejection by the task force of the manifestation approach." *Id.* The early draft was sent to other committees that also rejected the manifestation trigger:

> they found the concept unacceptable because, among other reasons, "it would permit a carrier to cancel following the first notice of injury and leave the insured without coverage for other injuries emerging from the same exposure," and because in many cases injuries sufficiently serious to trigger coverage could occur prior to any form of manifestation.

*Id.* (quoting Memorandum: "Action of the Liability Rating Committee of the Mutual

Bureau Meeting" (Sept. 12-14, 1961)).[18]

---

[18] Other historical documents also recorded that the manifestation trigger was unequivocally rejected from the 1966 occurrence-based CGL policy. A memorandum prepared by Mr. Schmalz in 1964 "explained that draft 'manifestation' trigger provisions had already been rejected in favor of a draft incorporating a continuing trigger[.]" Anderson, *Insurance Coverage Litigation* at 197 n.75 (quoting Richard A. Schmalz, *Various Approaches to Date – Occurrence Coverage*, attached to Memorandum from Subcommittee on Definition of Occurrence to Joint Forms Committee (Oct. 6, 1964)). George Katz, another member of the drafting committee, explained in a letter "that the 1966 [CGL] Form was written with the understanding that the injury sufficient to trigger coverage takes place prior to manifestation[.]" *Id.* at 198 (quoting Letter from George Katz to J.R. Garr (Jan. 18, 1966)). Mr. Katz related that coverage was designed to "coincide with the impact of the negligence or other wrongdoing upon the persons or property injured or destroyed, recognizing that this impact may not always be immediately manifest," and that the drafters had rejected any "reference to the requirement that injury or damage must become manifested during the policy term in order to fit the definition of 'occurrence,' under the new policies." *Id.* Finally, after a federal court decision finding asbestos-manufacturing defendants jointly and severally liable for a plaintiff's asbestos-related injuries (*Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076 (5th Cir. 1973)), an insurance industry meeting concluded that the occurrence-based CGL policy language did not have a manifestation requirement: "The majority view was that coverage existed for each carrier throughout the period of time the asbestosis condition developed, *i.e.*, from the first exposure through the discovery and diagnosis." *Id.* at 200 (quoting Memorandum of the Meeting of the American Insurance Association 1 (Apr. 21, 1977)). *See also Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983) (examining testimony offered by Mr. Schmalz and Mr. Katz, and stating "as draftsmen, they contemplated coverage for injuries which occur, rather than became manifest, during the policy period.").

There are also documents indicating that, in 1978, the insurance industry considered revising the 1966 CGL policy's occurrence language to incorporate a manifestation trigger. A meeting by the Insurance Services Office considered language "which arbitrarily makes the policy respond to all losses caused by injury which becomes manifest during the covered policy period regardless of when the injury may have actually occurred." Anderson, *Insurance Coverage Disputes* at 200 (quoting Insurance Service Office, Minutes of Meeting (Mar. 28, 1978)). The revision was subsequently abandoned, in part, because "[t]he idea of artificially assigning all losses to the policy during which first manifestation of injury takes place is so arbitrary that it may have serious adverse

Continued . . .

"The contemporaneous expressions of the drafting organizations' understanding of the appropriate trigger of coverage for delayed-manifestation claims . . . does not support the manifestation trigger." James T. Price, *Issues In Insurance Coverage For Environmental Liabilities*, 22B Rocky Mtn. Min. L. Sp. Inst. 10 (1988). Our review of the historical evidence shows that the drafters of the occurrence-based CGL policy contemplated coverage for injuries merely because they occur (either in a moment or gradually), rather than become manifest, during the policy period. The drafters of the 1966 CGL policy expressly declined to incorporate a manifestation trigger into the policy's provisions, finding after extensive debate that such a trigger was arbitrary and unworkable. We decline Westfield's invitation to incorporate one by interpretation six decades later.

3. *The majority of courts use the continuous trigger; no court applies the manifestation trigger to bodily injury, sickness, or disease claims*: We have analyzed five decades of case law from our sister state courts and federal courts that have examined the precise question before us today. We find that the majority of jurisdictions that have considered the question – sixteen by our count – have concluded that occurrence-based

---

effects on the willingness of underwriters to provide markets[.]" *Id.* at 201 (quoting ISO, Memorandum of the General Liability Rules and Forms Committee, Concepts Considered But Not Accepted (Sept. 28, 1979)).

22

CGL policies incorporate a continuous trigger of coverage in the context of bodily injuries.[19]

---

[19] The sixteen jurisdictions that we have found to use some form of the continuous, multiple, or triple-trigger theory of coverage in the context of bodily injuries are: Arizona (*Associated Aviation Underwriters v. Wood*, 98 P.3d 572, 602 (Ariz. Ct. App. 2004) (interpreting "bodily injury" to include cellular damage caused by trichloroethylene exposure "and, even after exposure has ceased, the continuing injurious process initiated thereby. In other words, both exposure and exposure-in-residence occurring during the policy period will trigger insurance coverage. In addition, the policy clearly is also triggered if 'disease' manifests itself during the policy period.")); California (*Montrose Chem. Corp. v. Admiral Ins. Co.*, 913 P.2d 878, 904 (Cal. 1995) (adopting the "continuous injury trigger of coverage" for "claims of continuous or progressively deteriorating damage or injury alleged to have occurred during [the insurer's] policy periods. Where, as here, successive CGL policy periods are implicated, bodily injury and property damage which is continuous or progressively deteriorating throughout several policy periods is potentially covered by all policies in effect during those periods.")); Connecticut (*R.T. Vanderbilt Co., Inc. v. Hartford Accident & Indem. Co.*, 156 A.3d 539, 571 (Conn. App. 2017) ("Consistent with the majority of our sister states, we adopt the continuous trigger theory, under which every policy in effect, beginning at the time of initial asbestos exposure and extending through the latency period and up to the manifestation of asbestos related disease, is on the risk for defense and liability costs.")); District of Columbia (*Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034, 1047 (D.C. Cir. 1981) ("We conclude, therefore, that inhalation exposure, exposure in residence, and manifestation all trigger coverage under the policies. We interpret "bodily injury" to mean any part of the single injurious process that asbestos-related diseases entail.")); Illinois (*Zurich Ins. Co. v. Raymark Indus., Inc.*, 514 N.E.2d 150, 161 (Ill. 1987) (adopting a triple-trigger; coverage existed for continued exposure to asbestos which caused bodily injury, sickness, or disease during the policy period)); Indiana (*Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 471 (Ind. 1985) ("coverage is triggered at any point between ingestion of DES and the manifestation of a DES-related disease. . . We therefore adopt the multiple trigger interpretation of the 'injury'/ 'occurrence' language in Lilly's policies.")); Kansas (*Atchison, Topeka & Santa Fe Ry. Co. v. Stonewall Ins. Co.*, 71 P.3d 1097, 1127 (Kan. 2003) (finding the "trigger of coverage was continuous" for noise induced hearing loss claims)); Maryland (*Rossello v. Zurich Am. Ins. Co.*, 226 A.3d 444, 456 (Md. App. 2020) ("Maryland's appellate courts have thus made clear that in extended exposure cases, continuous or progressive damage will constitute an 'occurrence' within the policy period that the asbestos remains present. In other words, a policy period is triggered when actual injury occurs and progressive injury can therefore trigger multiple policy periods. (Cleaned up.))); New Jersey (*Owens-Illinois, Inc. v. United*

Continued . . .

To the contrary, we have found no court that currently follows the manifestation trigger in the context of a bodily injury, sickness, or disease. For its part, Westfield cites to a single unpublished decision where a court applied the manifestation trigger to a bodily injury claim. In *State Auto Prop. & Cas. Ins. Co. v. H.E. Neumann Co.*, No. 2:14-CV-19679, 2016 WL 5380925, at *17 (S.D.W. Va. Sept. 23, 2016), the district court found "that the manifestation theory is the appropriate approach in the present context

*Ins. Co.*, 650 A.2d 974, 995 (1994) ("[W]hen progressive indivisible injury or damage results from exposure to injurious conditions for which civil liability may be imposed, courts may reasonably treat the progressive injury or damage as an occurrence within each of the years of a CGL policy. That is the continuous-trigger theory for activating the insurers' obligation to respond under the policies.")); Ohio (*Owens-Corning Fiberglas Corp. v. Am. Centennial Ins. Co.*, 660 N.E.2d 770, 791 (Ohio Com. Pl. 1995) (adopting a "continuous injury" rule; coverage is "triggered at any point along the continuum of injury from initial exposure to asbestos until diagnosis or death.")); Pennsylvania (*J.H. France Refractories Co. v. Allstate Ins. Co.*, 626 A.2d 502, 506 (1993) (approving trial court's adoption of the "multiple-trigger" theory; insurer is liable "if any one of the following occurred during the time an insurer was on the risk: exposure to asbestos or silica, progression of the pathology, or manifestation of the disease.")); South Carolina (*Pharmacists Mut. Ins. Co. v. Scyster*, 232 F. App'x 217, 226 (4th Cir. 2007) (applying South Carolina's "modified continuous trigger theory"; "[C]overage is triggered whenever the damage can be shown in fact to have first occurred . . . and . . . is triggered continuously while damage progresses thereafter[.]")); Vermont (*In re Ambassador Ins. Co.*, 275 A.3d 122, 127 (Vt. 2022) ("[E]xposure that occurred during the policy period triggers coverage, regardless of when the damage was discovered.")); Virginia (*C.E. Thurston & Sons, Inc. v. Chi. Ins. Co.*, No. 2:97 CV 1034 (E.D. Va., Oct. 2, 1998)); Washington (*Skinner Corp. v. Fireman's Fund Ins. Co.*, No. C95-995WD, 1996 WL 376657, at *1 (W.D. Wash. Apr. 3, 1996) ("Washington has adopted the 'continuous trigger rule' for insurance coverage in cases involving undiscovered, progressively worsening conditions causing injury or damage. Under the continuous trigger rule, every policy in force throughout the injury-causing process is triggered.")); and Wisconsin (*Plastics Eng'g Co. v. Liberty Mut. Ins. Co.*, 759 N.W.2d 613, 626 (Wis. 2009) ("Wisconsin has adopted the continuous trigger theory. This approach is especially useful in cases that involve an ongoing exposure to a harmful substance with harm occurring over several policy periods. A policy is triggered when injury occurs during the policy period. Under the continuous trigger theory, all policies are triggered from exposure until manifestation.")).

24

of latent diseases[.]" However, a cursory search of the citation history of *H.E. Neumann* reveals that the decision has no controlling effect because, before an appeal could be perfected, the district court vacated its decision.[20] Accordingly, we find no persuasive effect in *H.E. Neumann*.

4. *The policy language supports a continuous trigger*: Finally, in addition to the lack of historical and legal authority for Westfield's position, we also see no support for a manifestation trigger in the language of the insuring agreement in Westfield's CGL policy. Westfield's policy insures against damages from bodily injury "occurring" during the policy period, whether in the form of a physical injury, sickness, or disease, and even if caused by continuous or repeated exposure to harmful conditions. The insuring agreement provides coverage for damages in the form of an injury or property loss taking

[20] *See State Auto Prop. & Cas. Ins. Co. v. H.E. Neumann Co.*, No. 2:14-CV-19679, 2017 WL 1536464, at *1 (S.D.W. Va. Mar. 17, 2017) (providing the district court "VACATES its prior memorandum opinion and order entered on September 23, 2016").

Our research reveals one other federal court, in Massachusetts, that applied a manifestation trigger to bodily injuries. In *Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co.*, 523 F. Supp. 110 (D. Mass. 1981), the district court addressed the novel situation of a company that sold (and exposed individuals to) asbestos-containing products from 1931 to 1971, but only purchased liability insurance from 1968 to 1979. Under those circumstances, the district court found claims filed by individuals diagnosed with asbestos-related bodily injuries in the 1970s were covered under a manifestation trigger. The district court did so because the *insured* advocated for the trigger, and under the rule that "insurance policies must be strictly construed in favor of the insured and to promote coverage." *Id.* at 117, and the district court's decision was later upheld. *Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co.*, 682 F.2d 12 (1st Cir. 1982). Since the issuance of *Eagle-Picher*, Massachusetts state courts have, instead, become one of five states to adopt an exposure trigger. *A.W. Chesterton Co. v. Massachusetts Insurers Insolvency Fund*, 838 N.E.2d 1237, 1252 (Mass. 2005).

25

place during the policy period; it does not make coverage dependent on the time of discovery. Stated simply, the policy language "asks when damage happened, not whether it was manifest, patent, visible, apparent, obvious, perceptible, discovered, discoverable, capable of detection, or anything similar. Occurred means when *damage* occurred, not when *discovery* occurred." *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 30 (Tex. 2008).

Further, engrafting a manifestation trigger to limit coverage for progressive injuries would, in effect, turn Westfield's occurrence-based CGL policy into a claims-made policy.[21] While STW purchased and expected coverage against damage claims occurring over a twenty-five-year period, application of the manifestation trigger would telescope all claims that were caused or which developed over those years down to the policy in effect the moment the claimant was diagnosed. As one treatise notes, under the manifestation trigger "the period over which the loss is allocated is truncated." Seaman, *Allocation of Losses in Complex Insurance Coverage Claims* at § 2.2. Each successive future insurer would have the impossible burden of calculating and charging ever-higher premiums for

---

[21] Some authorities suggest that, if an insurance company believes a manifestation trigger offers advantages, then the company should expressly incorporate that language into its policies. *See Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d at 29 ("If the manifestation rule offers advantages of ease of application or proof for the insurer or insured, insurance companies might consider adopting policies where coverage depends on manifestation of damage, and seeking approval of such policies by Texas insurance regulators."); Steven Plitt, et al., 7 Couch on Ins. § 102:24 (2023) ("The parties may, of course, make their intent explicit in the contract of insurance by stating that coverage will be triggered by the occurrence of the harm producing event, by initial manifestation of damages, or by requiring that both occur within the policy period.").

26

the risk of a bodily injury manifesting as a result of STW's past conduct. The more likely alternative is that insurers would simply terminate STW's coverage to avoid those past claims.

Our recognition of the continuous trigger of coverage has the effect of spreading the risk of loss widely to all of the occurrence-based insurance policies in effect during the entire process of injury or damage. As one court said, the continuous trigger theory is "the most efficient doctrine [for allocation of liability amongst insurers] for toxic waste cases," because "it encourages all insurers to monitor risks and cha[r]ge appropriate premiums." *Montrose Chem. Corp. v. Admiral Ins. Co*., 913 P.2d at 903 n.23 (quoting Note, *Developments in the Law—Toxic Waste Litigation*, 99 Harv. L. Rev. 1458, 1581 (1986)). "Spreading the risk is conceptually more efficient" because "insurance companies can spread costs throughout an industry and thus achieve cost efficiency." *Owens-Illinois, Inc. v. United Ins. Co*., 650 A.2d at 992.

As the court in *Keene Corporation v. Insurance Company of North America* noted, while exposure to toxins may not cause an "immediate and discrete injury, the fact that it is part of an injurious process is enough for it to constitute 'injury' under the policies." 667 F.2d at 1046. A "bodily injury" under an occurrence-based policy can include the cellular damage caused by exposure to toxic conditions and, even after exposure has ceased, the continuing injurious process that is initiated by the exposure. The policy is also triggered if a bodily injury, sickness, or disease manifests itself during the

policy period. An occurrence-based CGL policy covers all injuries, sicknesses, or diseases that occur during coverage, not merely those that become manifest.

## IV. Conclusion

The question certified by the United States Court of Appeals for the Fourth Circuit asks, "At what point in time does bodily injury occur to trigger insurance coverage for claims stemming from chemical exposure or other analogous harm that contributed to development of a latent illness?" A continuous-trigger theory applies to determine when coverage is activated under the insuring agreement of an occurrence-based CGL policy if the policy is ambiguous as to when coverage is triggered. Under the continuous-trigger theory, when a claim is made alleging a progressive injury caused by chemical exposure or other analogous harm, every occurrence-based policy in effect from the initial exposure, through the latency and development period, and up to the manifestation of the bodily injury, sickness, or disease, is triggered and must cover the claim.[22]

Certified question answered.

---

[22] We emphasize that our holding that the continuous-trigger theory applies is limited, as our review is limited exclusively to the question certified by the federal Court of Appeals. It is not within our ambit to assess whether any policy has been triggered. It is axiomatic that, before coverage can be found to exist under a CGL policy, an occurrence as defined within the policy must be proven to have actually happened. *See*, *e.g.*, *Corder v. William W. Smith Excavating Co.*, 210 W. Va. 110, 556 S.E.2d 77 (2001) (determining that genuine issues of material fact precluded summary judgment as to whether an "occurrence" had taken place) (overruled on other grounds by *Cherrington v. Erie Ins. Prop. & Cas. Co.*, 231 W. Va. 470, 745 S.E.2d 508 (2013)).